IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kenneth Martin, et al., | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 03526 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| F.E. Moran, Inc., Fire | ) | |
| Protection of Northern Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth Martin, Aaron Truesdell, and Johnny Tejada, filed this action against

F.E. Moran Inc., Fire Protection of Northern Illinois (FPN) alleging discriminatory employment

practices. Martin, Truesdell and Tejada bring two counts each, one under Title VII and one

under 42 U.S.C. § 1981, based on their layoffs as well as FPN's failure to transfer or rehire them.

Tejada brings two additional counts, under the same statutes, for wage discrimination.[1]   FPN

moves for summary judgment on all counts with respect to all three Plaintiffs. For the foregoing

reasons, FPN's motions are denied. (Dkt. 193, 197, 201.)

## FACTS

The following facts are undisputed unless otherwise noted. FPN is an Illinois corporation

headquartered in Northbrook, Illinois, that installs, inspects, tests, and maintains fire protection

sprinkler systems in commercial and residential facilities. (Dkt. No. 21 at ¶¶ 8, 9.) In the

sprinkler fitter industry, employees are typically laid off when a project ends; then the sprinkler

---

[1] Count I: alleges layoffs and failure to transfer or recall pursuant to Title VII;Count II: alleges a wage discrimination claim in violation of Title VII; Count III: alleges a violation of 42 U.S.C. §1981 by Plaintiffs Martin, Truesdell, and Tejada; ; Count IV alleges a wage claim in violation of 42 U.S.C. §1981.

fitter may be transferred or rehired to another project. (Def.'s SMF at ¶ 28.) FPN does not have a specific hiring policy; sprinkler fitters usually obtain employment at FPN by calling a superintendent and/or the superintendent calling the sprinkler fitter. (Def.'s SMF at ¶¶ 28, 29.) FPN generally fills open positions on new projects with its current, regular workforce, if possible. (Def.'s SMF at ¶ 30.) Plaintiffs Aaron Truesdell, Kenneth Martin, and Johnny Tejada, are African-American and worked as journeymen sprinkler fitters, meaning they worked under a foreman who supervised them, or as foremen for FPN. Each of the Plaintiffs was laid off in 2010, and was never transferred or rehired to a new project. Plaintiffs assert that FPN's actions were motivated by racial discrimination. (Dkt. No. 21 at ¶ 11.) Throughout the Plaintiffs' employment, FPN was subject to the terms of the collective-bargaining agreement (CBA) that existed between the National Fire Sprinkler Association and Sprinkler Fitters and Apprentice Local Union No. 281 Chicago, Illinois. (Def.'s SMF at ¶ 26.)

## I. Administrative Change

Former FPN Superintendent, Edward Sullivan, was responsible for hiring Plaintiffs Martin and Truesdell. All three Plaintiffs had steady employment with FPN while Sullivan was in charge of hiring, layoffs, rehiring and transfer decisions at FPN. In February 2009, Scott Acred replaced Sullivan as Superintendent, and was joined in early 2012 by John Waters and Robert Barcik to form the "field management team." (Pl.s' SMF at ¶ 10.) Plaintiffs' expert, Dr. William Bridges, evaluated the effect of this administrative change, and found black fitters worked fewer hours and earned less in the period after Sullivan was replaced by Acred and eventually the field management team. (Pl.s' SMF at ¶ 11.)

Dr. Bridges' data analysis tracks the change in jobs after this administrative shift. His analysis shows that after the end of a big job (1,000 or more hours), white fitters were picked up

for other jobs 90% of the time in 2008 and 2009 and 100% of the time in 2010 and 2011, while in 2008, black fitters had some prospects for continued employment, but after that (2009-2011), they had no instances of continued employment. (Pls.' SMF at ¶ 25.) FPN disputes this evidence and argues Dr. Bridges' statistical analysis is deficient through its rebuttal expert, Dr. Guryan. In addition to the statistical deficiencies in Dr. Bridges methods, FPN points to the economic downturn in 2010 and explains that many sprinkler fitters were out of work during the period analyzed by Dr. Bridges. (Def.'s SMF at ¶ 60.) According to FPN's John Waters, another effect of the economic downtown was that FPN was able to selectively employ fitters based on industry reputation, skills, and productivity.[2] (Def.'s SMF at ¶ 60.)

Waters was not a fan of Truesdell and Martin, and always suggested reassignment of white fitters over them. (Pl.s' SMF at ¶ 40.) Additionally, Waters testified that when making hiring and layoff decisions, he ranked fitters by "ask[ing] around who was the best people[.]" (Waters Dep. at 147:3-24.) FPN maintained field rating charts, although it is unclear whether anyone on the field management team relied on them. For example, Truesdell had a B+ rating over the three years FPN tracked the sprinkler fitters. (Pl.s' Ex. 106, 107, 108.) Daniel Hughes, a white fitter, had a lower rating than Truesdell and still was working for FPN as of February 2015. (Pl.s' SMF at ¶ 57.) William Massey, Jr., another white fitter, had a lower rating than Truesdell, and was employed through February 2015. (*Id.*) Randy Iverson, who was also white, had a particularly poor work history with FPN, yet continued to work through 2014. (Pl.s' SMF at ¶ 22.)

Around the time that Acred took over as Superintendent, he and others were circulating emails which Plaintiffs' experts relied on in evaluating the cultural attitudes toward race in the

---

[2] FPN does not maintain any records tracking sprinkler fitter productivity on specific projects (Exhibit 35, Hebert dep., at 43:24-44:8). FPN does not conduct written performance evaluations of its sprinkler fitters (Exhibit 58, Def.'s Resp. to Pl,'s First Request to Admit, at no. 10).

new administration. On August 22, 2009, Scott Acred forwarded an e-mail to his field management team (Robert Barcik and John Waters) that stated: "I don't think being a minority makes you a victim of anything except numbers. The only things I can think of that are truly discriminatory are thinks [sic] like the United Negro College Fund, Jet Magazine, Black Entertainment Television, and Miss Black America… . I know a lot of black people, and not a single one of them was born in Africa; so how can they be 'African-Americans'?" (Pl.s' Exhibit 121.) The bottom of the email included the statement: "I was asked to send this on if I agree or delete if I don't. … If you agree, pass this on, if not delete." Acred forwarded another email on November 13, 2009 to Waters and Barcik that included the statement, "Governments, businesses and colleges have engaged in discrimination against white folks -- with affirmative action, contract set-asides and quotas -- to advance black applicants over white applicants." (Pl.s' Exhibit 42.) On February 29, 2012, John Hebert, then Vice President of FPN, e-mailed Ken Votava, a Sales Representative with FPN, "this eeo and mbe crap is a killer." (Pl.s' Ex. 112) (ostensibly referring to minority job participation requirements).

## II. Comparators

Plaintiffs identify thirteen comparators, all foremen, who were not laid off when the Plaintiffs were terminated in 2009 or 2010. Some of these fitters had the same, or lower, grade ratings than Martin and Truesdell. Two were described by former Superintendent Procter as "terrible," and by Barcik as "inexperienced." (Pl.s' SMF at ¶¶ 48, 54.) At least three were kicked off jobs for poor performance, and one of those three was *nearly* fired for having thousands of dollars of tools stolen from his service van parked outside of a bar. (Pl.s' SMF at ¶¶ 47, 56.)

### III. Plaintiffs

While the Plaintiffs share the above circumstances, they also provide separate and individual facts for their claims.

### A. Kenneth Martin

Kenneth Martin became a member of Local Union No. 281 in the late 1990's. (Def.'s SMF at ¶ 20.) He began working for FPN in 2005. He brings claims against FPN based on his 2009 and 2010 layoffs and the subsequent failure to transfer or rehire him to new projects.

Sullivan, who was working as a foreman at that time, recommended Martin to FPN based on Martin's hard-working reputation. (Pl.s' SMF at ¶¶3–4, 6.) In 2005, when Sullivan was the Superintendent, he rehired Martin. Sullivan promoted Martin to foreman in 2006. (Pl.s' SMF at ¶¶3–4, 6–8.) After Acred became the superintendent in September 2009, Martin was laid off from an FPN project. (Pl.s' SMF at ¶ 79.) In June 2010, he was rehired by FPN when FPN took over the Boone Project, which Martin was already working on for Universal Fire Protection (Universal), one of FPN's competitors. On the Boone Project, there had been leaks in the piping. Martin explains that these were due to the "terrible" threading on the piping from Universal, whose financial difficulties had impacted the quality of their supplies being used on the project. (Pl.s' SMF at ¶¶ 27, 29.) Nevertheless, FPN blamed Martin for the leaks, (Def.'s SMF at ¶¶ 47–56), despite Acred admitting that leaks sometimes happen on jobs and do not result in adverse employment actions against the fitters on those jobs. In fact, Acred did not hold Fitter Dan Hughes and Erik Massey responsible for floods which occurred on their watch, and Hughes and Massey continued to work for FPN after Martin was laid off. (Pl.s' SMF at ¶¶ 37, 44.) Martin was never reassigned to another job with FPN, but he continued to inquire, specifically making phone calls to Acred about whether there was available work. (Pl.s' SMF at ¶ 33.)

5

Martin filed a Charge of Discrimination with the EEOC on July 11, 2011. He received a notice of dismissal and right to sue dated July 20, 2011. (Def.'s SMF at ¶ 12.) He received a notice of the EEOC's intent to reconsider its dismissal dated September 19, 2011, stating that the EEOC was "rescinding the Dismissal and Notice of Rights… [and] will continue the investigation[,]" (Def.'s SMF at ¶ 13, Pl.s' SMF at ¶¶ 76, 77.) The second right-to-sue was letter mailed on February 6, 2013, and told Martin that his Title VII claims "must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice, or your right to sue based on this charge will be lost." (*Id.*) (emphasis in original).[3] (Def.'s SMF at ¶¶ 12, 16–17.)

## B. Aaron Truesdell

Aaron Truesdell became a member of Local Union No. 281 in 1989 and continued his membership through his retirement on December 31, 2014. (Def.'s SMF at ¶¶ 1, 20.) Truesdell was first hired by FPN on May 15, 2006. (Def.'s SMF at ¶ 31.) He brings claims against PFN for his 2009 and 2010 layoffs and their subsequent failure to transfer or rehire him after the 2010 layoffs.

Former FPN Superintendent, Edward Sullivan, hired Truesdell in 2005 based on Truesdell's good reputation in the field. (Pl.s' SMF at ¶¶2, 5–6.) While Sullivan made hiring, transfer, layoff, and rehiring decisions, Truesdell found steady work with FPN; in many of those jobs, Sullivan promoted Truesdell to foreman. (Pl.s' SMF at ¶¶ 2–6.) In July 2009, Truesdell took over the Chase Bank job as a foreman, replacing non-African-American, Randall ("Randy") Iverson. (Def.'s SMF at ¶¶ 34, 35.) When the field management team took over, the team made the August 14, 2009, decision to layoff Truesdell from the Chase Bank job. (Def.'s SMF at ¶ 34;

---

[3] Receipt starts the running period of the limitations period. *Prince v. Stewart*, 580 F.3d 571, 574 (7th Cir. 2009). When the date of receipt is unknown, as it is here, the receipt is presumed to be five days from the mailing date. *See Lloyd v. Sullivan*, 882 F.2d 218, 218 (7th Cir. 1989). Under this five-day presumption, Martin filed his original *pro se* complaint within 88 days of receiving this second right to sue, on May 10, 2013.

Pl.s' SMF at ¶ 54.)  Iverson had an especially poor track record.  Metcalfe testified that Iverson was constantly late, (Metcalfe Dep. at 307:14–308:2), and Acred testified about some of Iverson's more dramatic mistakes, including pulling the fire alarm in a hospital while filling the sprinkler system.  (Acred Dep. at 168:4-12.)  Nevertheless, although laid off from the Chase Bank job, Iverson continued to work steadily into 2014 for FPN on other jobs.  (Pl.s' SMF ¶ 22.)

After the Chase Bank job, Truesdell found work with FPN competitor, Universal.  (Def.'s SMF at ¶ 41.)  While working on that job, Truesdell turned down an offer from FPN Project Manager Barcik to work on an FPN project, but asked if he could circle back with Barcik when the project was over; he did so, and Barcik hired Truesdell to work for FPN on the Lee Pasture Job.  (Def.'s SMF at ¶ 41; Barcik Dep. At 133:14–18; 134:1–3; 134:12–21.)  Truesdell's final job for FPN was as the foreman on the Wal-Mart project. He was laid off on September 29, 2010.  (Def.'s SMF at ¶ 50.)  Truesdell was the last sprinkler fitter on the job and was laid off, according to FPN, because the project was complete.  (Def.'s SMF at ¶ 50.)  Following the completion of the Wal-Mart project, Acred met with a group of individuals to create the "After Action Report," documenting the failures on the Wal-Mart project.  (Def.'s SMF at ¶ 52.)  Acred noted in this report that the "[w]rong foreman [was] running [the] project."  (*Id*.)  At the same time, Acred pointed out problems with the Wal-Mart project that were beyond Truesdell's control, for example, problems due to sales representative Scott Katcher's poor management of the project.  (Herbert Dep. at 61:21-63:18) ("it was just not a very well-managed project from day one."); (Pl.s' SMF ¶¶ 40-41.)  Truesdell was never rehired by FPN.  Plaintiffs cite nine projects after the 2010 layoff that FPN had work available for fitters.  Plaintiffs do not dispute that Truesdell did not reach out to FPN for employment after his 2010 layoff.  (Pl.s' SMF at ¶ 44.)  FPN, however, never posted fitter job openings or informed Local 281 of upcoming jobs.

(Pl.s' SMF at ¶ 13.)  Nevertheless, FPN continued to tap into its work pool for fitters that had same or lower ratings than Truesdell. (Pl.s' SMF at ¶ 13.)  Neither party presents evidence as to whether or not these fitters specifically contacted FPN for employment or whether FPN reached out to them.

On July 6, 2011, Truesdell filed an Intake Questionnaire and a charge with the EEOC. (Def.'s SMF at ¶ 3.)  In his charge, he alleged the September 2010 layoff was unlawful discrimination based on his race but he did not explicitly mention a failure to rehire.  (Def.'s SMF at ¶¶ 4, 5.)  The EEOC issued a notice of right to sue letter on August 12, 2011 which Truesdell received.  (Def.'s SMF at ¶ 8.)  On September 19, 2011, Truesdell received a letter from the EEOC rescinding the dismissal of his charge and stating the EEOC would continue its investigation.  Truesdell did not know why the EEOC rescinded the right to sue and heard nothing further from the EEOC until his counsel, Judson Miner, contacted the EEOC on February 4, 2013, and requested the EEOC issue a notice of right-to-sue on behalf of Truesdell and co-plaintiff Martin.  (Truesdell Dep. 176:12-177:19, Def.'s SMF at ¶ 14.)  The February 4, 2013 notice states: "Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice, or your right to sue based on this charge will be lost."  (*Id.*) (emphasis in original).[4]

---

[4] Taking into account the five-day presumption, Truesdell filed his initial complaint on May 10, 2013, within 88 days of receiving this right to sue.

### C.  Johnny Tejada

Plaintiff Johnny Tejada is of Panamanian ancestry and also identifies as African-American.  (Def.'s SMF at ¶ 1; Tejada Dep. Tr., at 10:9-11:2; 11:22-24.).  Tejada brings claims against FPN for his 2010 layoff, FPN's subsequent failure to transfer or rehire him after that layoff, and a claim for wage discrimination.  On December 13, 2001, Tejada became a member of the Sprinkler Fitters and Apprentice Local Union No. 281 ("Union") and his membership was active through January 31, 2013.  (Def.'s SMF at ¶ 25.)

Tejada's first job for FPN was the Powell School project.  The George Sollitt Construction Company (Sollitt) contacted John Hebert, senior vice president of FPN, to inquire as to whether FPN could assist in completing a project on the Adam Clayton Powell, Jr. Elementary School, located at 7511 South Shore Drive, Chicago, Illinois 60649 (Powell project), as Universal —Sollitt's then-current fire protection subcontractor—was unable to complete the job due to financial hardships.  (Def.'s SMF at ¶ 32.)  Hebert agreed that FPN would take over the job.  (*Id.* at ¶ 33.)

FPN specifically ensured that the formal agreement with Sollitt would not require any minority job participation.  (*See* Def.'s SMF at ¶ 33) (The subcontract stated: "[t]his agreement stipulates that F.E. Moran Fire Protection will not supply any of the aforementioned minority participation on this project and therefore will not be held liable to potential penalties associated with shortfalls.").  The rider, "Rider II," in Sollitt's form subcontracts normally requires minority job participation.  (*See* Rahn Dep. at 72:23-73:4) ("Q: "that was your preference to have Rider II in subcontracts, correct?  A: As a general rule, yes.  Q: Okay.  But F.E. Moran did not want Rider II in the subcontract.  A: That's apparent yes.").

9

For purposes of continuity, and based on communications between FPN and Sollitt, FPN decided to hire Tejada to work on the Powell project on June 28, 2010. (Def.'s SMF at ¶ 40.) The parties dispute whether or not Tejada was initially hired as the foreman. Tejada believed that he was the foreman because he had been a foreman on other projects for Universal,[5] and on the Powell Project in particular. (Tejada Dep. at 118:16-18; 120:2-3; 120:10-12; 123:1-14.) He also believed that he was the foreman on the project because, when FPN took over the job, he was the only fitter, and under the collective bargaining agreement when there is only one fitter, that fitter is considered the foreman. (*See* Def.'s SMF at ¶ 55, Ex. A, Dep. Ex. 10); (*see also* Tejada Dep. at 123:1-14.) While Tejada did not list his job as foreman on his EEOC intake questionnaire and instead listed his job as journeyman, (Tejada Dep., Ex. 15 at FPN 543-544), he nevertheless stated that he believed he was discriminated against because he never received a foreman's pay. (Tejada Dep., Ex. 15, FPN 543-544.)

One week[6] after FPN took over the Powell Project, FPN assigned Eric Woolwine as the foreman of the project. Woolwine had a stellar reputation according to the testimony of FPN's employees. (*See, e.g.* Def.'s SMF at ¶ 44) (He was known in the industry as "Eric 'Awesome' for a reason.") Later, FPN determined that, based on the Powell project, Woolwine was more productive than Tejada. (Barcik Dep. at 119:1-3) ("Eric was cutting 23-plus [sprinkler] heads in a day and Mr. Tejada was probably at 15"; but also testifying that 15 is "a good number[.]").

In the midst of the Powell project, on September 17, 2010, FPN laid off Tejada. (Def.'s SMF at ¶ 52.) Woolwine remained on the Powell School job following Tejada's layoff, and at the end of the project Woolwine was transferred to another project. (¶ 54.) Although he was not

---

[5] However, during one of these projects, Tejada testified that he had waived the foreman's pay because he understood that Universal was having financial difficulties. (*Id.* at 138:6-18; 139:3-6.)

[6] On the questionnaire, Tejada lists the dates of wage discrimination as June 14 to June 18, 2010; during his testimony, he explained that the wage discrimination occurred during the first week he worked on the Powell job, which was actually June 28, 2010 to July 2, 2010. (Def.'s SMF at ¶ 47.)

transferred or rehired, Tejada believed that there was work available for him at the time of his layoff. (Tejada Dep. 17:23-18:2.)

The parties dispute the extent of Tejada's efforts to seek employment after this layoff. (*See* Def.'s SMF at ¶¶ 62–63; Pl. Dep. Tr., at 217:14-17.)  According to FPN, Tejada made no efforts to put his name on the Union's "out-of-work" list, and did nothing more than leave two general voice messages for an FPN superintendent.  (Def.'s SMF ¶ 62.)  FPN also points out that Tejada waited nearly a year after his layoff  before contacting his supervisor, Acred.  But Tejada explained in his testimony that he waited until summer before contacting Acred because "our work is really seasonal driven.  So when it starts getting warm again, works really pick up [sic]. And that's when I was really pounding the pavement as far as trying to find work again, [] and at that point I was desperate, and I started calling F.E. Moran again.  And it was more than just that one time.  I kept calling them because I never got any answer back whatsoever."  (Tejada Dep. 45:15-46:3.)  Acred testified that he could not recall whether or not Tejada called him to express an interest in rehire, and that he did not keep a log of his phone calls or messages.  (Acred Dep. 216:10-217:5.)  There is clearly a dispute as to how far Tejada went to seek further employment from FPN.

On June 30, 2011, Tejada filed an intake questionnaire and a Charge of Discrimination with the EEOC, bringing allegations of race and sex discrimination.  (Def.'s SMF at ¶¶ 3, 6.)  In the intake questionnaire, Tejada lists Eric Woolwine (mistakenly called "Wrightwood") as an individual that was treated better than him and states that while Tejada was "let go," Woolwine ultimately "went on to work other projects" with FPN.  (Pl.s' SMF at ¶45.)  Tejada ultimately received the operative right-to-sue notice on August 12, 2013, and filed this complaint on

November 12, 2013.[7]  Tejada believed that he was discriminated against because of the events surrounding the Powell Project, and admits that no one ever made any specific race-based comments to him during his employment with FPN.  (Def.'s SMF at ¶ 61.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Whether a fact is material depends on the underlying substantive law that governs the dispute.  *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted).  "A factual dispute is 'genuine' only if a reasonable jury could find for either party."  *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted).  Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).  "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322).  The nonmovant must "go beyond the pleadings…to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor."  *Id*. at 1168-69 (internal quotation marks and citation omitted).  Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party."  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

---

[7] Taking into account the five-day presumption, the August 12, 2013 right-to-sue letter was received on August 17, 2013 and the November 12, 2013 complaint, was filed 87 days later.

## DISCUSSION

Plaintiffs' claims for discrimination arise under Title VII and Section 1981. "[I]n enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, and ordained that its policy of outlawing such discrimination should have the "highest priority." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (internal citation omitted) (collecting cases). Specifically, Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2. When plaintiffs allege that they have been treated differently because of their race, as plaintiffs have here, they must prove the "employer had a discriminatory motive for taking a job-related action." *Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016)

In pertinent part, Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, [and] to sue . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). Section 1981 authorizes claims for retaliation where "one person takes action against another for asserting the right to substantive contractual equality[.]" *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008)). "[U]nlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Bray*, 681 F.3d at 896 (citation and internal quotation marks omitted). There is a "necessary overlap" of the contract rights protected by § 1981 and the employment rights guarded by Title

13

VII of the 1964 Civil Rights Act. *See* 42 U.S.C. § 2000e–3(a); *CBOCS*, 553 U.S. at 455 (remedies available under Title VII and Section 1981 related). Courts therefore "apply the same elements to retaliation claims under Title VII and § 1981." *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009).

FPN asserts that Plaintiffs' Title VII and 1981 claims fail for reasons of timeliness, Plaintiffs' failure to exhaust administrative remedies, and additionally fail as a matter of law. In short, FPN waived the timeliness issues, Plaintiffs sufficiently exhausted administrative remedies, and beyond those procedural issues, the claims raise issues of fact that preclude summary judgment.

## I.    Timeliness

FPN asserts that Plaintiffs' claims are time-barred. Specifically, FPN argues the (1) the Title VII claims are time-barred because Tejada failed to file suit within 90 days, and (2) the 1981 claims are time-barred by the two-year statutes of limitations period. The Court need not address the merits of this argument because FPN waived these arguments.

The Federal Rules of Civil Procedure require that all affirmative defenses be specifically pled. Rule 8(c) states that "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including ... duress ... [and] lack of consideration." However, failure to plead affirmative defenses in an answer only results in waiver of the defense if the plaintiff would be harmed as a result of the delay. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005); *see also Glob. Tech. & Trading, Inc. v. Tech Mahindra Ltd*., 789 F.3d 730, 731 (7th Cir. 2015) ("Several of our decisions hold that a district court may (though it need not) permit an untimely affirmative defense, provided the plaintiff does not suffer prejudice from the delay."). Generally, such harm can be assumed when the affirmative defense is raised only after

the close of discovery, such that the plaintiff is unable to adequately respond to its factual basis.
*See, e.g., Laborers' Pension Fund v. Dynamic Wrecking & Excavation, Inc.*, No. 07 C 2156,
2008 WL 4874110, at *6 (N.D.Ill. June 13, 2008) (citing to *BMO Capital Markets Corp. v.
McKinley Medical LLC*, No. 06 C 6071, 2007 WL 2757172, at *10 (N.D.Ill. Sept. 18, 2007))
(plaintiff harmed when defendant raised affirmative defense of moral duress only in response to
plaintiff's motion to summary judgment).

For both Title VII and Section 1981, the applicable statutes of limitation are not
jurisdictional. *See U.S. v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) (a party "must clear a
high bar to establish that a statute of limitations is jurisdictional. In recent years, we have
repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress
has 'clearly state[d]' as much.") (internal quotations omitted.); *see also Zipes v. Trans World
Airlines, Inc.*, 455 U.S. 385 (1982) (the filing provisions in Title VII cases are "not a
jurisdictional prerequisite to suit in a federal court, but a requirement that, like a statute of
limitations, is subject to waiver, estoppel, and equitable tolling."); *see, e.g.*, *Williams v. U.P.S.,
Inc.*, No. 87 C 6360, 1991 WL 18207 (N.D.Ill. Jan. 30, 1991) (finding waiver appropriate where
Defendant asserted statute of limitations defense "long after the close of discovery").

FPN does not contest that it raised these defenses for the first time on Summary
Judgment, but retorts that there was no prejudice in the delay. Nothing has occurred in discovery
giving rise to the defense that was not present when FPN filed their answer and motion to
dismiss. FPN's argument that there is no prejudice to Plaintiffs, however, lacks merit. When a
party knows of an affirmative defense prior to or during discovery, it can strategize accordingly.
For example, Plaintiffs may have made more significant efforts to seek discovery on tolling

where appropriate; here, Plaintiffs would be deprived that benefit if the Court allows FPN to proceed with a statute of limitations defense.

## II.     Failure to Exhaust Remedies

In order to maintain a claim under Title VII, a party must exhaust its administrative remedies.[8]  *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992).  The scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. *Id.*  This ensures that the employer receives notice of the conduct about which the employee is aggrieved and guarantees that the EEOC and the employer have an opportunity to settle the dispute.  *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).  The Court begins the analysis with the understanding that EEOC charges should be construed liberally because they are completed by laypersons.  *Cheek*, 31 F.3d at 500 (citing *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992).  A Title VII plaintiff need only set forth claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations."  *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971)), cert. denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976) (internal quotations omitted).

---

[8] The exhaustion analysis also contemplates that the employee filed procedures within a timely matter under EEOC regulations.  Although FPN waived its timeliness defenses, the Court notes that the Plaintiffs all filed their lawsuits within 90 days of the operative notices of the right to sue.  The Court is not persuaded by FPN's arguments that Martin and Truesdell's second right-to-sue letters are not effective because the EEOC never validly revoked the original right-to-sue letters.  Both Martin and Truesdell received notice of the EEOC's intent to reconsider its dismissals within 90 days of the original dismissal, *see* 29 C.F.R. § 1601.19(b).  FPN cites to no precedential case law that these letters were insufficient for purposes of revoking the original dismissal.  FPN's argument that there was no actual evidence of an ongoing investigation is even less persuasive as they do not cite to any support for the proposition that Plaintiffs would be privy to the details of the investigations.  After receiving the intent to reconsiders, Plaintiffs requested and were sent the subsequent right-to-sue letter which explicitly stated that Plaintiffs Title VII claims "must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice, or your right to sue based on this charge will be lost."  (emphasis in original).  Based on all of these facts, Martin and Truesdell's complaints were timely under 29 C.F.R. § 1601.19(b).  Tejada's August 12, 2013 right-to-sue letter was received on August 17, 2013 and the November 12, 2013 complaint, was filed 87 days later.

Two threshold issues apply with respect to all of the Plaintiffs EEOC charges. First, FPN asserts that the Plaintiffs did not include a pattern or practice discrimination claim in their EEOC charges. None of the Plaintiffs needed to exhaust for pattern or practice, however, because they are not pursuing that claim. Instead, Plaintiffs rely on FPN's employment "practice of transferring white sprinkler fitters . . . instead of laying them off," as evidence in support of the individual disparate treatment claims. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805-06 (1973) (appropriate evidence demonstrating pretext for failure to rehire included the employer's general policy and practice with respect to minority employment.) FPN acknowledges that pattern and practice evidence can be collateral to evidence of specific discrimination against the Plaintiff. (Dkt. 198 at 14.)

Second, Plaintiffs all based their EEOC charges on their layoffs and do not explicitly mention the failure to transfer or rehire. But the distinction between "layoff" and "failure to transfer or rehire" claims must be viewed in the context of the sprinkler-fitter industry. A layoff decision and a decision not to transfer / rehire are not necessarily separate and distinct acts. When a project ends, sprinkler fitters are typically laid off and then subsequently transferred or rehired to a new project. (Def.'s SMF at ¶ 28.) FPN's claims that Plaintiffs' EEOC Charges that only reference layoffs cannot provide the basis to their transfer / rehire claims. But this looks at the layoffs in a vacuum without the context of the industry – in fact, it would be difficult to determine that a layoff, in and of itself, was discriminatory, as it is the outcome at the end of nearly every project. Instead, the failure to transfer / rehire after the layoff is the operative employment decision for analyzing possible discrimination with respect to most of Plaintiffs' claims. It is reasonable to presume that the EEOC, in reviewing cases in this industry, would

investigate subsequent failures to rehire / transfer in reviewing Charges pertaining to layoffs.[9] Therefore, the "complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 500.[10]

FPN relies on *Sauzek v. Exxon Coal USA, Inc.* for the proposition that Plaintiffs cannot expect their failure to transfer/rehire claims to reasonably grow out of their EEOC charges that cite only their layoffs, but the case is distinguishable. 202 F.3d 913 (7th Cir. 2000). Exxon, the employer, had closed a coal mine and laid off the miners, and when it re-opened the mine, it recalled many of the workers who had been laid off. Indeed, the lower court in *Sauzek* granted summary judgment for Exxon because plaintiffs' only evidence supporting their failure to transfer/recall claims was a "three month gap between their EEOC charges and Exxon's decision not to rehire them," and this was insufficient to conclude the two events were related. *Id.* at 919. There was no similar evidence in *Sauzek* that the nature of layoffs and recalls are tied together in the mining industry. And there was only one massive lay off at issue. Here, FPN works on several projects and layoffs occur at the end of each project. The layoff and the recall are not distinct as they are in *Sauzek*.

Finally, FPN asserts Martin and Truesdell do not allege in their EEOC charges that FPN discriminated against them in any manner prior to the 2010 layoff. Neither filed a charge regarding their 2009 layoffs. But their evidence surrounding the 2010 Charges provide a sufficient basis for their failure to rehire/transfer provide and raise an issue of fact as to whether

---

[9] With respect to Tejada in particular, not only does he reference his layoff, he additionally lists Eric Woolwine (mistakenly listed as Eric "Wrightwood") as an individual who was treated better than him and states that while Tejada was "let go," Woolwine ultimately "went on to work other projects" with FPN. (Pl.s' Exhibit 7.)

[10] FPN asserts that the "limited, short-term employment is substantially similar," (Dkt. 236 at 7), to the facts in *Sauzek*, but *Sauzek* does not clearly state, and FPN does not provide, how the facts in the employment at issue there were limited and short-termed.

FPN violated Title VII and 1983. Therefore, the Court does not need to consider the 2009 layoffs.

## III.   Title VII and § 1981 Claims

Because the same methods of proof and standards apply to discrimination claims brought pursuant to Title VII and § 1981, the following discussion applies with equal force to Counts I through III. *See Sublett v. John Wiley & Sons*, 463 F.3d 731, 736 (7th Cir. 2006) (quoting *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996)) ("[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical.") (internal quotations omitted).

Until very recently, a district court would separate evidence into two buckets. First, a district court would determine whether the plaintiff had satisfied the so called "direct method" of proof; that is, it would look to see whether the plaintiff had "present[ed] sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)) (internal quotation marks omitted). Second, the district court would determine whether plaintiff had satisfied the "indirect method" of proof, such as that described in *McDonnell Douglas Corp.*, 411 U.S. at 802. Under the indirect method of proof, a plaintiff could shift the burden of proof to the defendant after making a *prima facie* case, showing: that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (internal quotations and citations omitted). If the plaintiff makes her prima facie case, the burden shifts to the defendant to give a non-

discriminatory reason for treating the plaintiff the way it did, and if the defendant meets its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was just a pretext. *McDonnell Douglas*, 411 U.S. at 802, 804.

In *Ortiz v. Werner Enterprises*, the Seventh Circuit eliminated the "direct" versus "indirect" evidence distinction from analysis of employment discrimination claims. 834 F.3d 760, 765 (7th Cir. 2016). The Circuit explicitly overruled numerous decisions "to the extent that these opinions insist on the use of the direct-and-indirect framework."[11] *Id.* at 765-66. The decision does not disturb the burden-shifting framework. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Thus, the Court first assesses whether the Plaintiffs established a prima facie case of discrimination under the *McDonnell Douglas* framework, and then "assess cumulatively all the evidence presented by [Plaintiff] to determine whether it permits a reasonable factfinder to determine that [the employment decision] was attributable to his race. *Id.* Under *McDonnell Douglas*, each Plaintiff has the initial burden to show that (1) he is a member of a protected class; (2) he performed reasonably on the job in accordance with his employer's legitimate expectations; (3) despite his reasonable performance he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *See David*, 846 F.3d at 225. If Plaintiffs satisfy this burden, then "the employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th CIr. 2014). Pretext means "'a dishonest explanation, a lie rather than an oddity or an error.'" *Sweatt v.*

---

[11] "The use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years. During the last decade, every member of this court has disapproved both the multiple methods and the search for mosaics." *Id.* at 764.

*Union Pac. R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)).

FPN only asks the Court to analyze the evidence under the *McDonnell Douglas* test and argues each of the Plaintiffs fails to demonstrate a prima facie case.  But even under *McDonnell Douglas*, each of the Plaintiffs raises an issue of material fact as to whether FPN laid off or failed to transfer / rehire them based on racial discrimination.

## A.  Evidence Pertaining to All Plaintiffs

Plaintiffs introduce emails demonstrating racial animus, which were circulated among Acred and his field management team.  (*See, e.g.,* Pl.s' Exhibit 121) (Acred emails, "[t]he only things I can think of that are truly discriminatory are thinks [sic] like the United Negro College Fund[.]")  The emails do not reference the individual Plaintiffs.  However, social psychology expert, Dr. Destiny Peery, examined the emails and found that they contained explicit racial stereotypes; aversive racism; a work environment ripe for the presence of implicit racial bias; and employment processes particularly prone to the influence of implicit racial bias due to their subjectivity and lack of accountability and transparency.  (Pl.s' SMF at ¶41.)  Among the most revealing is an email sent on February 29, 2012, by John Hebert, then Vice President of FPN, e-mailed Ken Votava, a Sales Representative with FPN, "this eeo and mbe crap is a killer."  (Pl.s' Exhibit 112) (referring to minority job participation requirements).  Herbert is the same Vice President who negotiated that contract with Universal and ensured that there would be no minority hiring requirements, even though it was typically Universal's practice to include a rider with such requirements.  These emails raise an issue as to whether FPN's management participated in a racist culture.[12]

---

[12] Metcalfe also testified that he was "sure" he heard the word "nigger" at FPN.  (Metcalfe Dep. at 161-165.)

### 1.      Martin

Martin bases his Title VII and Section 1981 claims on his layoffs in 2009 and 2010, as well as FPN's failure to transfer or rehire him after the 2010 layoff.  Because Martin worked until the job was completed, the Court finds that FPN had a legitimate business reason for those layoffs, the consistent practice of laying off the last fitter on the job.  Instead, Martin's discrimination claim survives because of FPN's failure to transfer / rehire Martin after the 2010 layoff.  FPN asserts that the failure to transfer / rehire claim fails because Martin fails to establish elements two, three, and four of his prima facie case: (2) he is qualified for the position; (3) he applied for and was rejected for the position sought; and (4) the position was granted to a person outside the protected class who is similarly or less qualified than him.

Martin meets element two, since he demonstrates his qualifications both through the testimony of former superintendent Sullivan, his many years in the industry, as well as his FPN grade ratings of Martin.  Martin also meets the third element.  After he was laid off, Martin continued to inquire about possible work with FPN, specifically making phone calls to Acred about availability.  (Pl.s' SMF at ¶ 33.)  Finally, similarly situated white sprinkler fitters with the same or lower grade ratings continued to obtain employment after Martin's 2010 layof An analysis of similarly-situated individuals considers "all relevant factors," which depend "on the context of the case," and "should not be applied mechanically or inflexibly."  *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir. 2007) (internal citations omitted) (noting, in disciplinary cases, similarly situated employees will likely "shar[e] the same supervisor, performance standards, and 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's

treatment of them,'" but that factors such as employment classification and full-time or part time status may not necessarily be relevant to the analysis).

Because Martin meets his prima facie case, the burden shifts to FPN to demonstrate a legitimate, non-discriminatory reason for the failure to transfer / rehire.   FPN asserts that after the Boone project, Martin was no longer qualified for sprinkler fitter work.  Because there were leaks on the Boone Clinton job, FPN had to return to the job to fix the leaks.  (Def.'s SMF at ¶¶ 47–56.)  There are a few issues of material fact surrounding this element.  As Martin points out, FPN took over for Universal on this project.  Universal was in a bad financial situation, putting their sprinkler fitters in a bind when it came to materials – and Martin noticed issues with the pipe threading resulting from this.  The leaks, therefore, were not necessarily within his control.  Moreover, similarly-situated sprinkler fitters worked on projects with not only leaks but "floods," and still managed to work through 2015.  Also, while FPN points to the economic downturn as a cause of drying up sprinkler fitter business, according to Plaintiffs, the downturn did not prevent FPN from consistently rehiring and transferring white sprinkler fitters through 2015.  Even if the Court were to accept FPN's proffered legitimate reason for not rehiring Martin, there is enough on this record, between the emails and Plaintiffs' expert's data, and the continued employer of white fitters who were responsible for floods while Martin was responsible for leaks, to create an issue of fact as to whether the proffered reason is pretextual. Summary Judgment is denied on Martin's Title VII and Section 1981 claims because there is a dispute of fact as to whether FPN's decision to not rehire or transfer him after his 2010 layoff was discriminatory.

### 2. Truesdell

Like Martin, Truesdell bases his Title VII and Section 1981 claims on both FPN's 2009 and 2010 layoffs, as well as the failure to transfer or rehire him after the 2010 layoff. Because Truesdell worked until the jobs were completed in 2009 and 2010, the Court finds that FPN had a legitimate business reason for those layoffs, the consistent practice of laying off the last fitter on the job. Instead, Truesdell's discrimination claim survives because of the subsequent failure to transfer / rehire Truesdell.

*Truesdell Failure to rehire / transfer*

This is especially true in light of Truesdell's evidence of comparators, the next element that FPN asserts Truesdell failed to meet in his prima facie case. Although he did not specifically identify them in his deposition, there is evidence on the record that similarly-situated foremen who were rated the same or lower than Truesdell were treated more favorably than him. Truesdell's similar or higher ratings than comparators FPN decided to transfer or rehire is enough to raise an issue of fact.

FPN asserts that Truesdell's failure to rehire / transfer claim fails on the second, third, and fourth elements: (2) Truesdell failed to establish that he was qualified for the position; (3) that he applied for and was rejected for the position sought; and (4) that the position was granted to a person outside the protected class who was similarly situated. The Court will only analyze these three elements of Truesdell's prima facie case.

For the second element, Truesdell set forth evidence that he was qualified for available work after his 2010 layoff. Truesdell had a good reputation in the industry according to former superintendent Sullivan. The only evidence FPN relies on to assert otherwise is not strong enough to grant summary judgment. FPN asserts that Truesdell did not meet FPN's performance

24

expectations on the Wal-Mart project. *See Argyopoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (finding poor performance at as legitimate non-discriminatory reason.). But in the *Argyopoulos* case, cited to by FPN, the employer compared negative reports from different years to show poor job performance, and did not base its employment decision on the alleged failure of a single project. *Id.* at 735. Whether Truesdell performed in accordance with expectations, and who was to blame for the failings of the Wal-Mart project, are disputed facts. Sullivan, who Plaintiffs assert was in charge before the the Acred administration took over, recognized Truesdell as a good worker. (Pl.s' SMF at ¶¶ 5–6.) This is consistent with Truesdell's grade ratings in 2008, 2009 and 2010. Next, Truesdell meets the third element of his prima facie case given the realities of the sprinkler fitter industry. It is undisputed that Truesdell did not apply for any work with FPN after the 2010 layoff, but sprinkler fitters do not submit formal applications to FPN. (Def.'s SMF ¶¶ 28–30.) The process is more informal, as FPN does not have a specific hiring policy but instead will reach out to sprinkler fitters, or sprinkler fitters reach out to FPN, for available work. (*Id.*) It may hurt Truesdell at trial that he did not reach out to FPN at all after his 2010 layoff about the possibility of rehire. For his prima facie case, however, it is enough that Truesdell remained a member of Local 281, did not signal in any way that he was unavailable for work and that it was FPN's practice to reach out to sprinkler fitters about available work, and did not do so here, possibly with discriminatory motives. Finally, Truesdell meets the fourth element because FPN sets forth evidence that white employees with similar or lower ratings, and some who were responsible for project failings that were worse than Wal-Mart, continued to work on FPN jobs through 2015.

Shifting the burden to FPN, whether FPN had a legitimate, non-discriminatory reason for the failure to transfer / rehire is a question for the trier of fact based on the disputes in this record.

FPN's main evidence of a legitimate, nondiscriminatory reason is Truesdell's performance on the Wal-Mart project. That evidence is not dispositive of any of the parties' disputes. Specifically, while Acred's actions in creating the "After Action Review" after Wal-Mart could be used by FPN as evidence of Truesdell's performance, the report could also indicate animosity toward Truesdell in light of the evidence that blame was hoisted on Truesdell for issues that were not in his control. (Pl.s' SMF ¶¶ 40-41.) For the same reasons discussed with respect to Martin, even if the Court were to accept FPN's proffered legitimate reason for not rehiring Truesdell, there is enough on this record to create an issue of fact as to whether the proffered reason is pretextual. Summary Judgment is denied on Truesdell's Title VII and Section 1981 claims because there is a dispute of fact as to whether FPN's decision to not rehire or transfer him after his 2010 layoff was discriminatory.

3. **Tejada**

There is a dispute of material fact with regards to both Tejada's discrimination claim based on his lay-off from the Powell project, as well as FPN's failure to transfer / reassign him, and his wage discrimination claim.

*Tejada's Discrimination Claim based on his lay-off*

FPN argues Tejada fails to meet a prima facie case with regard to the 2010 layoff under two prongs of *McDonnell Douglas* because he cannot establish he is a member of the protected class, or that there are similarly-situated non-black employees. The Court will only analyze these prongs, and presume the rest weigh in Tejada's favor.

First, FPN asserts that Tejada is not a member of a protected class because in his Complaint, unlike the other Plaintiffs, Tejada only alleges that he is "black of Panamanian ancestry." Later, in his deposition he identifies as African-American. However, FPN offers no

legal support that it is insufficient Tejada identified as black in his Complaint. There is enough evidence on the record to determine that Tejada is a black man living in America, and that Title VII and § 1981 protect him.

Next, Tejada must demonstrate that similarly-situated African-American employees were treated more favorably. Tejada presents evidence he was replaced as foreman on the Powell Job by Eric Woolwine, a white sprinkler-fitter, who had less experience than Tejada. (SMF ¶ 42.) When Universal was going out of business, FPN took over the subcontract, and FPN agreed with Universal that it made sense to hire Tejada for purposes of continuity. At that point, Tejada was the only sprinkler fitter on the job and attended foreman meetings. After approximately a week, FPN hired Woolwine to be the foreman on the project.

Whether Woolwine was a similarly situated employee treated more favorably is a disputed issue of fact. First, there is the issue of whether Woolwine and Tejada shared the same position. If Woolwine had a higher position, then he could not be Tejada's comparator. *See Hoffman v. MCA, Inc*., 144 F.3d 1117, 1124 (7th Cir. 1998) (affirming summary judgment and finding that "lower-ranking" sales employees were not similarly situated to the management-level plaintiff). Before Woolwine came on the project, it seems that at least for a period of time Tejada was the foreman. Moreover, the fact that Tejada became a journeyman, and was no longer a foreman after Woolwine was hired, could also be evidence in and of itself that FPN discriminated against him. Therefore, the eventual difference in Woolwine and Tejada's position, under these circumstances, should not be fatal to Tejada's claim.

If Tejada meets his prima facie case, then the burden shifts to FPN to demonstrate a legitimate, non-discriminatory reason for Tejada's layoff. FPN asserts that it made Woolwine the foreman, and transferred / rehired him at the end of the Powell project because he had high

recommendations regarding his prior work performance. (SMF ¶ 42.) Some of this evidence raises issues. For example, FPN's evidence that Woolwine was a more productive pipefitter was based on information gathered *after* the Powell project and therefore could not have been considered in the decision to hire him for the Powell project, although it may have been a consideration in whether to transfer him to another job at the end of the project. (*See* Barcik Dep. 118:14-25) ("Eric was cutting 23-plus [sprinkler] heads in a day and Mr. Tejada was probably at 15. So there was a productivity disparity.") FPN further asserts that Tejada was laid off for the job on which he was hired, which Tejada admits. (SMF ¶¶51-52, 54-55.) *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001) (noting that, in some cases, it may be reasonable to infer that an employer that hires someone from a protected class, and then promptly fires them, is not guilty of discrimination because there would have been no incentive to hire the protected worker to begin with). Here, it is not persuasive that because FPN hired Tejada in the first place, it could not have discriminated against him. In *EEOC v. Our Lady of the Resurrection Med. Ctr.*, cited by FPN, there was no similar reason of continuity to hire the plaintiff and therefore the fact that plaintiff was hired was in and of itself evidence of the employer's nondiscrimination. 77 F.3d 145, 152 (7th Cir. 1996). Under these facts, however, the trier of fact could reasonably find that Tejada was only hired because FPN agreed it made sense for purposes of continuity, but within a week ensured that a white foreman was put on the project.

Fitters are typically laid off at the end of a project and that is a legitimate business reason. However, if Tejada had remained the foreman, he would not have been laid off until the end of the project. Because he was replaced by Woolwine, who remained on the job until it was

finished, and Tejada was laid off before the end of the project, Tejada can demonstrate that his layoff in this particular context was discriminatory.

*Tejada – Failure to Transfer / Rehire Claim*

There is a factual dispute as to whether FPN failed to transfer / rehire Tejada on the basis of his race, and whether the transfer went to a non-black who was similarly situated. At the time Tejada was laid off from the Powell job, in 2010, Tejada presents evidence that FPN had available other jobs that Tejada was qualified for. (Pl.s' at SMF ¶ 21.) But, for example, FPN opted to not use Tejada for the Ogden job, which was ongoing at the time of Tejada's layoff from Powell.[13] Woolwine was transferred to another job upon completion of the Powell project. There is enough evidence here to create a dispute of fact.

There is also a dispute as to whether Tejada applied for open positions after he was laid off. FPN argues Tejada made no efforts to put his name on the Union's "out-of-work" list, and did nothing more than leave two general voice messages for an FPN superintendent. (Def.'s SMF ¶ 62.) Tejada explains that FPN's criticisms are not in sync with the reality of the fitter industry; for example, there are no applications for fitter jobs. *See Box v. A&P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985) ("When an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat.") In *Box*, the Seventh Circuit held that an employee can make a prima facie case by showing that had he known of the open position, he would have applied for the position. *Id.* The Circuit concluded, however, that the

---

[13] Barcik received an e-mail from Turner regarding shortfalls in minority workforce participation on the Ogden School (Pl.s' Exhibit 102) ("As of the end of Jan 2011, we show a shortfall or above on the following: Minority workforce journeymen: 0% of 20%." Plaintiffs also assert that: "Of the four fitters in Barcik's e-mail, only Massey (white) went on to work the Ogden School job; Tejada, Sink (Asian), and Torres (Hispanic) did not (Exhibit 83, FPN payroll data report (selected jobs) at pp. 85-88)." (Tejada SMF ¶ 24.)

evidence did not suggest "anything more than a vague interest" and plaintiff needed to show more.  *Id*.  Whether Tejada showed more than a vague interest is a disputed fact on the pleadings.  FPN also criticizes Tejada for waiting nearly a year after his layoff in September 2010 before contacting Acred.  But, Tejada testified that he waited until summer before contacting Acred because "our work is really seasonal driven.  So when it starts getting warm again, works really pick up [sic].  And that's when I was really pounding the pavement as far as trying to find work again, [] and at that point I was desperate, and I started calling F.E. Moran again.  And it was more than just that one time.  I kept calling them because I never got any answer back whatsoever."  (Tejada Dep. 45:15-46:3.)  Acred testified that he could not recall whether or not Tejada called him to express an interest in rehire, and that he did not keep a log of his phone calls or messages.  (Acred Dep. 216:10-217:5.)  Again, there are enough disputed facts regarding how far Tejada went to seek further employment from FPN to make summary judgment inappropriate.

**B.  Tejada- Wage Discrimination Claim**

A prima facie case of wage discrimination requires a plaintiff to produce evidence that he or she was paid less than a similarly situated person of a different race.  *Johnson v. University of Wis.-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995).  The same evidence supporting the survival of the termination and failure to transfer / rehire claims also supports the survival of the wage claim.  The parties dispute whether Tejada was discriminated against when he received the wage of a journeyman for his work on the Powell School project.  (*See* Tejada's Resp. to SMF ¶ 47.)  Under the collective bargaining agreement, foremen are paid more than journeymen.  For reasons already discussed, Tejada believed that he was the foreman on the Powell project.  However, Tejada was not paid at the rate of a foreman for his work on the project, not even for

the time period before Woolwine was hired. FPN misconstrues Tejada's testimony as an admission that the wage disparity was not based on race:

> Q: And you weren't paid as a foreman; correct?
> A: Correct.
> Q: And that's what's required under the collective bargaining agreement, correct?
> A: That is correct.
> Q: So that has nothing whatsoever to do with race, correct?
> A: No. [objection] No, I don't believe that him – because he was foreman and I was not has nothing to with my race as far as the pay. That's how it is. If you're a foreman, you get paid more. It doesn't matter because you're white or because you're black.

(Tejada Dep. at 151:24–152:17.) FPN interprets Tejada's testimony to indicate that Tejada did not believe he was paid less based on his race. (Def.'s SMF at ¶ 49.) Tejada disputes this interpretation, and explains that he only meant that the collective bargaining agreement dictates wage regardless of race, but that he was discriminated against when he was paid as a journeyman the first week that he was a foreman, and the discrimination continued in the subsequent weeks because he thought he would be a foreman and would not be replaced. The testimony FPN relies on is too unclear to be dispositive of the wage claim. It is reasonable to connect the evidence of discrimination to the wage discrepancy. Tejada alleged in his EEOC Intake Questionnaire that he believed he was discriminated against when he "did duties of & was told I'd be foreman, Instead was replaced by a Jr. Caucasian." (Tejada Dep., Ex. 15.) The questionnaire supports that Tejada believed that Woolwine's replacing him as foreman was a discriminatory act. It reasonably follows that when Tejada was paid less for the same work as Woolwine, this was further evidence of discrimination.

The wage claim also is not preempted by § 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 141 *et seq.* (LMRA). FPN relies on the case *Gelb v. Air Con. Refrigeration & Heating, Inc.*, but the case is distinguishable. 356 Ill. App. 3d 686, 694-96 (IL 1st Dist. 2005).

31

In *Gelb*, there was no federal claim at issue. There, the plaintiffs sought relief under the Illinois Minimum Wage Act, 820 ILCS 105/1 *et seq.* (West 1998), and not Title VII. As Tejada points out, Title VII rights are independent of any rights afforded by a collective bargaining agreement. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974). Section 301 does not completely preempt all claims that touch upon rights that have some connection to a collective bargaining agreement. *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 864 (7th Cir. 1998). At trial, FPN may invoke the collective bargaining agreement in its defense and that the facts underlying Tejada's wage discrimination claims overlap with any claim he could have brought under the collective bargaining agreement. But, as the Court noted in its opinion on motion to dismiss, that does not result in preemption. *See Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800-801 (7th Cir. 2013) (explaining that defending against a claim by referring to a collective bargaining agreement does not transform the claim into one brought under § 301). For those reasons, summary judgment is denied on Tejada's wage claim.

## CONCLUSION

For these reasons, the Court denies FPN's Motions for Summary Judgment against Martin [193], Truesdell [197], and Tejada [201].


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: _4/10/2017_

32