# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KENNETH MARTIN, et al., )
)
          Plaintiffs, )
)
    v. )    Case No.  13 C 3526
)
F.E. MORAN, INC. FIRE PROTECTION OF )    Judge Virginia M. Kendall
NORTHERN ILLINOIS, )
)
          Defendant. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Kenneth Martin, Aaron Truesdell and Johnny Tejada filed this action against their former employer, F.E. Moran, Inc., Fire Protection of Northern Illinois (FPN) alleging racially discriminatory employment practices.  In their First Amended Complaint, Plaintiffs each alleged violations of Title VII of the Civil Rights Act (Count I) and of 42 U.S.C. § 1981 (Count III) based on their layoffs and FPN's failure to transfer or rehire them.  (Dkt. No. 21.)  Plaintiff Tejada also alleged two claims of wage discrimination in violation of Title VII of the Civil Rights Act (Count II) and of 42 U.S.C. § 1981 (Count IV).  (*Id.*)

On April 10, 2017, the Court denied FPN's Motion for Summary Judgment as to all of Plaintiffs' claims.  (Dkt. No. 280.)  Specifically, with regard to Counts I and III, the Court found that Martin's and Truesdell's discrimination claims survived, not because of their respective layoffs, but because of FPN's subsequent failure to transfer or rehire.  (Dkt. No. 280 at 22, 24.)  The parties subsequently narrowed the remaining claims by stipulation.  Plaintiff Tejada stipulated that he waived his claim for unlawful discrimination under Title VII in Count I (Dkt. No. 301) and for wage discrimination under Title VII and Section 1981 in Counts II and IV.

1

(Dkt. No. 294.)  Plaintiffs Martin and Truesdell stipulated that they waived their claims for unlawful discrimination in Counts I and III based on FPN's failure to rehire them following their 2009 layoffs.  (Dkt. No. 307; *see also* Dkt. No. 220 at 7, n.8-9; Dkt. No. 221 at 7, n.6-7.)

The Court held a twelve-day bench trial between April 10, 2017 and May 12, 2017 to resolve the remaining claims, which included: unlawful discrimination against Martin under Section 1981 (Count III) based on FPN's failure to transfer him after his 2009 layoff and under Title VII (Count I) and Section 1981 (Count III) based on FPN's failure to transfer or rehire him after his 2010 layoff;  unlawful discrimination against Truesdell under Section 1981 (Count III) based on FPN's failure to transfer him after his 2009 layoff and under Title VII (Count I) and Section 1981 (Count III) based on FPN's failure to transfer or rehire him after his 2010 layoff; and unlawful discrimination against Tejada under Section 1981 (Count III) based on his 2010 layoff and FPN's subsequent failure to transfer or rehire him.  After listening to the testimony presented by both parties and reviewing the documents entered into evidence at trial, the Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

## I.      FPN Organization

FPN employs sprinkler fitters to install sprinklers for fire safety in buildings ranging from public schools, to banks, to high rises in and around Illinois.  FPN was formed in 2007, when a corporation named F.E. Moran Fire Protection Northern Illinois split into two offices: FPN, covering the Chicagoland area, and F.E. Moran, which continued to operate out of Champaign, Illinois.  (Tr. 1396:18-1397:5 (Metcalfe)).  Both FPN and F.E. Moran are wholly-owned subsidiaries of parent company Armon, Inc. ("Armon") (Tr. 1398: 11-13, 1399: 3-5 (Metcalfe)).

FPN operated separate and apart from other affiliated companies of the Armon Group and operated out if its own location in a separate building as Armon. (Tr. 1489:24-1490:2, 1492:19-21 (Metcalfe)).

Alan Metcalfe served as president of FPN from September 2007 until April 1, 2016. (Tr. 1396:18-1397:5, 1401:1-2 (Metcalfe)). As president, Metcalfe reported to Brian Moran, the president and later CEO of Armon. (Tr. 1399:22-1400:6 (Metcalfe)). Between 2008 and 2017, John Hebert served under Metcalfe as vice president and later senior vice president of FPN. (Tr. 1271:16-22 (Hebert)). In both roles, Hebert oversaw all departments within FPN and was responsible for the superintendents. (Tr. 1254:4-25 1303:5-6 (Hebert)). Hebert testified that he could not recall there being any African-American executives at FPN during the time he worked there. (Tr. 1279:24-1281:10 (Hebert)). Neither Metcalfe nor Hebert made any employment decisions regarding sprinkler fitters including Plaintiffs. (Tr. 1302:25-1303:4, 1312:8-13 (Hebert); Tr. 1033:8-10 (Acred); Tr. 1490:6-21, 1491:3-16 (Metcalfe)).

Superintendents are responsible for scheduling the manpower and materials necessary to complete jobs won by FPN. (Tr. 855:6-8 (Sullivan); Tr. 1014:23-25 (Acred)). Accordingly, superintendents have ultimate authority at FPN over employment decisions regarding sprinkler fitters, including whether to hire, transfer, layoff or rehire a particular fitter. (Tr. 854:14-24 (Sullivan); Tr. 1797:25, 1798:1-2, 9-23 (Waters); Tr. 1127:18-20, 1214:6-8 (Barcik); Tr. 1343:12-16 (Hebert)). Superintendents are also responsible for finding and assigning minority fitters to comply with minority hiring goals. (Tr. 1788:5-7 (Waters)).

Some jobs require a project manager, whose responsibility it is to manage the budget, review and monitor the project design, handle logistical issues including safety, track the number of hours used on a job and generally to ensure that the superintendents have whatever

3

information they needed for that particular job. (Tr. 1125:8-18, 11:26:5-9 (Barcik); Tr. 1746:23-1747:9, 1753:8-24 (Waters)). During the time Plaintiffs were employed by FPN, project managers also provided input related to hiring decisions, in particular with regard to productivity, based on the project managers' observations in the field. (Tr. 1209:18-1211:11, 1215:7-11, 1216:12-17 (Barcik); Tr. 1911:25-1912:5 (Waters)).

Edward Sullivan, Jr. served as senior superintendent from 2001 until February 2009, initially for F.E. Moran Fire Protection Northern Illinois and, after the split, for FPN. (Tr. 853:12-17; 857:10-12 (Sullivan); Tr. 917:2-14 (Acred); Tr. 1126:10-16 (Barcik)). During that time, other FPN superintendents reported to Sullivan, including: John Waters, who served as superintendent from summer 2007 until early 2008; Scott Acred, who became superintendent in January 2008; Steve Procter, who served as superintendent from July 2008 until January or February 2009; and Mark Parker. (Tr. 855:14-22, 857:13-18 (Sullivan); Tr. 1734:15-1734:11 (Waters); Tr. 917:2-4 (Acred); 1623:18-1624:20 (Procter)). FPN has never hired an African-American superintendent; all FPN superintendents have been white males. (Tr. 1405:21-1406:2 (Metcalfe)).

Sullivan testified that the FPN "field management team"—a group of superintendents and project managers that discussed hiring decisions—existed as early as 2007, while he was senior superintendent. (Tr. 888:25-889:3 (Sullivan); Tr. 1797:13-1798:8 (Waters)). The field management team continued after Sullivan was transferred in 2009 and as other individuals became superintendent.

Sullivan testified that as senior superintendent, he made employment decisions in conjunction with other superintendents, including Acred, and would consider the opinions of project managers. (Tr. 875:24-876:4; 877:11-15 (Sullivan)). Sullivan, who worked with Acred

for more than 20 years, testified that Acred is a good evaluator of personnel and job situations and that he valued Acred's opinion. (Tr. 891:6-12 (Sullivan)). In fact, Sullivan and Acred separately testified that, during Sullivan's tenure as senior superintendent, they never disagreed with each other's evaluations of personnel or opinions regarding layoffs or transfers. (Tr. 891:13-17 (Sullivan); Tr. 1044:1-6 (Acred)).

When Sullivan was transferred to a different role in February 2009, Acred became primarily responsible for employment decisions related to fitters and made those decisions in conjunction with the field management team, which from 2009 until roughly 2012 consisted of Acred, project manager Robert Barcik, and project manager John Waters.[1] (Tr. 918:3-919:18 (Acred); Tr. 1755:5-10 (Waters)). Despite project managers' involvement on the field management team, superintendents at all times retained ultimate authority for hiring decisions and for finding and assigning minority fitters for jobs. (Tr. 1214:6-7 (Barcik); Tr. 1787:16-1788:11, 1797:25-1798:23 (Waters)).

## II.    Collective Bargaining Agreement and the Local 281

At all relevant times, FPN was subject to the terms of the collective bargaining agreement ("CBA") between the National Fire Sprinkler Association and Local 281 for its sprinkler fitters within Local 281's geographic jurisdiction, which includes all of Chicagoland and Northwest Indiana. (Final Pretrial Order (FPTO), Ex. 1 Statement of Uncontested Facts (SOUF) at ¶ 5; JX36 Collective Bargaining Agreement (CBA), eff. June 2008; JX37 CBA, eff. June 2011). FPN can hire only union workers and largely hires fitters from Local 281. (Tr. 859:23-860:4 (Sullivan)).

---

[1] Waters worked for FPN as a superintendent from summer 2007 until early 2008, a project manager from 2008 to early 2011, and then as a sales executive. (Tr. 1734:15-1735:11 (Waters)).

There are two classes of employee fitters, foreman and journeymen. Foremen take on a managerial role and journeymen work under a foreman. A foreman's responsibilities include testing equipment, tracking hours worked by journeymen and completing payroll pay work. (Tr. 53:16-54:8. (Martin)). Martin and Truesdell worked in both foreman and journeyman sprinkler fitter roles for FPN; Tejada worked only as a journeyman fitter for FPN. (Tr. 53:5-8 (Martin); Tr. 323:6-7, 20-23 (Truesdell); Tr. 774:15-17 (Tejada)). The terms and conditions of Plaintiffs' employment with FPN, including pay, were governed by the union contract. (Tr. 380:17-19 (Truesdell); Tr. 793:4-6, 794:15-17 (Tejada); JX36; JX37).

Local 281 sprinkler fitters are hourly wage employees; there is no provision for a salary in the CBA. (JX36; JX37). The CBA does provide different wage rates for foremen and journeymen fitters and requires that "[o]ne man shall be designated as Foreman on each job" for the purposes of wages; therefore, if there is only one fitter assigned to a job, that fitter receives foreman pay. (JX36; JX37; Tr. 163:21-23 (Martin); Tr. 382:5-10 (Truesdell); Tr. 794:5-14 (Tejada)).

The CBA also requires that contractors provide a fitter four-hour notice that he or she is being laid off. (JX36; JX37). The CBA does not include any provisions addressing the hiring, transfer, layoff or rehire of fitters—including any provision requiring that hiring decisions be based on seniority. (*Id.*). It does, however, include an anti-discrimination policy, which states: "There shall be no discrimination with regard to race, color, religion, sex, age or national origin by either the Union or the Employer relative to employment or conditions of employment." (*Id.*) None of the Plaintiffs ever filed any type of grievance with Local 281 regarding their employment with FPN either during their employment or thereafter. (Tr. 162:21-23, 187:23-188:2 (Martin); Tr. 392:6-8 (Truesdell); Tr. 811:11-16 (Tejada)).

Local 281 does not have a system for letting its members know of available jobs. (Tr. 98:10-12 (Martin); Tr. 337:24-338:6 (Truesdell)). Rather, it is standard in the sprinkler fitter industry for fitters to obtain work by calling superintendents of contractors to inquire as to any available jobs. (Martin Tr. 138:9-21; 205:14-23; Truesdell Tr. 393:15-395:6; Tejada Tr. 778:24-779:9, 822:23-823:2; Tr. 1039:20-24 (Acred); Tr. 1311:13-24 (Hebert); Tr. 1799:16-19 (Waters)).

## III.    FPN Hiring Practices

### A.    The Hiring Process Generally

FPN sales personnel prepare and submit bids for jobs. (Tr. 1736:21-1738:4; 1738:11-1739:24 (Waters)). One of the largest components of such bids is the estimated labor cost—*i.e.,* the amount of labor and number of hours to be spent on the job. (Tr. Tx. 1742:18-1743:9 (Waters)). Whether the job is ultimately profitable depends, in part, on whether the labor estimate in the bid is accurate. ((Tr. 1743:10-24; 1746:14-17 (Waters); Tr. 1107:10-21 (Acred)).

Superintendents are made aware of upcoming jobs as soon as the job is sold. ((Acred 30(b)(6) Dep. Des. 23:3-8, 23:14-17)). They are then responsible for evaluating how many employees will be needed for the job and when the job will start. (*Id.*). FPN does not seek new employees each time it gets a new job; rather, the superintendent often transfers fitters from one job to another. (Acred 30(b)(6) Dep. Des. 45:2-11)

When FPN does hire new fitters for a job, it does so either from an out-of-work list provided by the union or based on calls informing superintendents that certain fitters need work. (Tr. 859:19-22 (Sullivan)). Consistent with industry standard, FPN does not have a policy or practice of posting or advertising openings for sprinkler fitter jobs nor did it have an application form for sprinkler fitter jobs. (FTPO, Ex. 1 at ¶ 6; Tr. 1311:25-1312:2 (Hebert); Tr. 138:22-139:11 (Martin); Tr. 395:7-9 (Truesdell); Tr. 1034:11-16 (Acred); Tr. 1799:20-21 (Waters)). Whether a

7

fitter actually gets work from calling the superintendent "always" depends, at least in part, on timing.  (Tr. 895:14-25 (Sullivan); Tr. 1980:15-21 (Waters)).

At the end of a job, the fitters are either transferred to other jobs or laid off.  (Tr. 861:21-25 (Sullivan)).  The fitter might also be asked to "sit" meaning to wait a few days or weeks for work without being laid off.  (Tr. 1913:21-1914:13; 1935:2-11 (Waters)).  While "sitting" the fitter is free to seek employment elsewhere including for a competitor sprinkler fitter company.  (Tr. 1980:11-14 (Waters)).  A fitter's benefits including health insurance only accrue based on actual hours worked; therefore, when not working, a fitter not only earns no wage but also accrues no benefits.  (Tr. 1980:3-10 (Waters); Tr. 1983:11-1984:4 (Waters)).  If laid off completely, however, the fitter can at least collect unemployment benefits.  (Tr. 1913:21-1914:1 (Waters)).

Sullivan testified that whether a fitter is transferred or laid off depended primarily on FPN's upcoming workload.  (Tr. 861:21-862:6 (Sullivan)).  He explained that as a job was winding down, the superintendent forecasts incoming jobs and estimates manpower needs.  (Tr. 860: 17-25 (Sullivan)).  He described it as "kind of a juggling act, just trying to . . . keep people employed."  (*Id.*)  Sullivan explained also that, to assist in this process, superintendents would keep schedules of ongoing and upcoming jobs and have meetings with project managers and designers about those jobs.  (Tr. 860:17-861:20 (Sullivan)).

Acred testified that when making a transfer decision, he considered the work available, if any, and who was best suited for that work, taking into account the speed and productivity of the fitters.  (Tr. 1028:14-25, 1029:1-2, 25 1030:1-15 (Acred)).  Similarly, Waters testified that whether a fitter was transferred to another job or asked to "sit" depended on the timing, the jobs available, and the qualities and qualifications of the particular fitter.  (Tr. 1980:15-21 (Waters)).  Plaintiff Martin testified that, as he understood it, if a fitter was "doing a good job" and "FPN had

8

work," FPN would transfer the fitter to a different job site when another job ended. (Tr. 140:9-17 (Martin)).

FPN presented some testimony that fitters with company service trucks, which hold all materials necessary for a job, were more likely than fitters without service trucks to be transferred or kept busy during slow times and not laid off. Waters testified, for example, that fitters with trucks could more easily get from job-to-job with all the necessary tools and, therefore, were more often transferred out to work for short periods of time on multiple jobs. (Tr. 1804:17-1810:6, 1862:9-1863:2, 1979:15-1980:2 (Waters)). Waters also testified that FPN gave service trucks to the best foreman, or the "all-star team" (Tr. 1805:9-17, 1962 (Waters)); however, there was little other evidence confirming that was the case.

Armon's Employee Manual applies to all Armon entities, including FPN. The Manual contains an Equal Employment Opportunity policy that prohibits discrimination based on race. (JX38 at 23; Tr. 1447:16-1448:14 (Metcalfe)). The Manual also contains an Anti-Harassment policy that prohibits the use of ethnic slurs or racial epithets and other conduct based on a person's race and provides a complaint procedure through which employees can report concerns. (JX38 at 23-24; Tr. 1505:17-1506:10 (Metcalfe)). No other provisions in the Manual bear directly on the hire, transfer, layoff, or recall of sprinkler fitters. (JX38; 11/12/15 Acred 30(b)(6) Dep. Des. 9:2-10:10).

Metcalfe ensured FPN supervisors and employees were trained on the EEOC policy. Tr. 1514:6-8 (Metcalfe)). Metcalfe testified that FPN held a training sometime before 2009 that involved counsel and brought in a subject matter expert to explain FPN's expectations; FPN witnesses testified that, since then, FPN has held periodic refresher trainings during which the policy and complaint procedures were explained. (Tr. 1514:9-23 (Metcalfe); Tr. 1311:6-8

(Hebert); Tr. 1250:12-23 (Barcik)). Some FPN witnesses testified they were aware of the policy and understood it prohibited discriminating based on race; however, Acred could not recall any training on the policy within the last ten years. (Tr. 1271:17-24, 1310:20-25 (Hebert); Tr. 1037:17-1039:15 (Acred); Tr. 1215:13-24 (Barcik)). Martin, Truesdell and Tejada also each received and reviewed a copy of the policy during new employee orientation and understood that it prohibited discrimination based on race; Martin testified that he never received training on the policy. (Tr. 67:11-17, 161:19-162:16 (Martin); Tr. 389:23-392:1 (Truesdell); Tr. 769:6-7, 821:13-822:13 (Tejada); DX22; DX59; DX110). None of the Plaintiffs raised any complaints of discrimination with FPN. (Tr. 162:21-23 (Martin); Tr. 392:9-12 (Truesdell); Tr. 825:14-16 (Tejada)). Hebert never received any complaints that Acred was making unfair decisions, acting in a discriminatory manner or had made race-based statements. (Tr. 1308:1-10 (Hebert)). No one ever made a complaint concerning discrimination or racist comments at FPN to either Procter or Barcik. (Tr. 1694:12-20, 1695:3-13 (Procter); Tr. 1215:25-1216:2 (Barcik)).

B.     The Great Recession

The sprinkler fitter industry began to slow down in 2008 when the Great Recession hit. (Tr. 198:21-199:25, 200:1-10; 209:24-210:7 (Martin); Tr. 882:1-8, 907:18-908:1 (Sullivan); DX99). Sullivan testified that, toward the end of his tenure, FPN was not getting as many jobs; as a result, just prior to his transfer, he had to lay off more people as jobs finished up. (Tr. 882:1-14, 900:10-22 (Sullivan)). He testified also that he could not recall there being any upcoming jobs when he left his role as senior superintendent in February 2009. (Tr. 901:11-14 (Sullivan)). Acred similarly testified that the economic slowdown began just as he became superintendent in early 2008 and that he faced layoff decisions as a result. (Tr. 1051:15-19 (Acred)).

There was, however, contradictory testimony regarding the actual impact of the Great Recession on FPN's business, particularly after 2010. Hebert testified that, in the time period of about 2009 to 2010, a handful of the 60 to 70 Local 281 signatory contractors—*i.e.*, FPN's competitors—actually went out of business. (Tr. 1312:5-7, 1314:5-19 (Hebert)). Metcalfe testified that, during that same time period, the total workforce at FPN decreased from 81 employees in 2009 to just 71 in 2010, and the number of sprinkler fitters employed decreased by nearly half: from 47 in 2009 to 28 in 2010. (Tr. 1515:21-1517:24 (Metcalfe); Tr. 1300:9-16 (Hebert)). Metcalfe described 2010 as "a terrible year." (Tr. 1517:11 (Metcalfe)).

Yet, Metcalfe also testified that FPN's workload "doubled" in 2010. (Tr. 1523:3-11 (Metcalfe)). Similarly, Hebert testified that FPN's business increased "significantly" "from 2007 . . . until [his] last day of employment." (Tr. 1385:25-1387:5 (Hebert)). Thus, to the extent FPN's business was affected by the recession, it began to recover at least as early as 2010.

## C. Performance Evaluations

Due to the economic downturn, around 2008 FPN put a greater focus on the speed and productivity of its workforce in order to better compete against fellow contractors fighting for the same jobs. (Tr. 895:1-25 (Sullivan); Tr. 1042:11-25 (Acred); Tr. 1826:8-17 (Waters)). In order to evaluate its workforce and as discussed in more detail below, the field management team developed tools for ranking fitters based on performance. (Tr. 1313:1-12 (Hebert)). FPN did not focus solely on fitters; it also assessed other personnel, for example, in design and sales, and made personnel cuts and pay cuts throughout the company. (Tr. 1301:1-8, 1313:1-17 (Hebert)). However, FPN could not cut the pay of its fitter workforce because it is governed by the CBA. (Tr. 1313:18-1319:4 (Hebert)).

When Metcalfe became president of FPN in late 2007, he pushed for the development of a workforce rating system in an effort to create a standardized, objective approach to evaluating and improving the FPN workforce. (Tr. 1491:17-1492:7 (Metcalfe)). Around February 2008, the field management team created a chart called the "Manpower skills list," that assigned each fitter a "weighted rank"—based on ratings in 12 labor skills (*i.e.*, "large projects," high rise," "relocates," etc.) and seven soft skills (*i.e.*, customer relations, constructive communication, paperwork, etc.)—and a number one through four indicating that individual's value to the company. (JX22; Tr. 879:2-25, 880:1-881:6, 888:3-9 (Sullivan); Hebert (individual) Dep. Des. 142, 159-160). Acred, Waters and Barcik testified that speed and productivity were factors considered in rating a fitters' labor skills. (Tr. 1110:21-1112:8 (Acred); Tr. 1212:19-1213:14 (Barcik); Tr. 1836:7-11 (Waters)). On the February 2008 chart, Martin received a weighted rank of "81" out of a possible 160, and a value rank of "3"; Truesdell received a weighted rank of "84" and value rank of "3." (JX22).

In September 3, 2008, the field management team created the "Field Rating System" chart, which ranked fitters by letter grade. (Tr. 888:10-889:17, 897:1-4 (Sullivan); JX21.) To create this chart, the field management team held meetings and discussed each fitter's qualifications—for example, certain skills in installation, experience with different systems, attitude, etc.—and assigned rankings based on that discussion. (Tr. 871:22-873:3 (Sullivan)). Metcalfe sat in on the meetings but provided no input on the rankings. (Tr. 872:9-10 (Sullivan); (Tr. 1155:10-13 (Barcik)). Hebert also was involved in setting up the ranking systems but provided no input on the evaluations. (Tr. 1301:6-14 (Hebert)). The field management team did not use a rubric, scoring sheet, or any other written criteria to assign the letter grades. (Tr. 872:11-873:3 (Sullivan)). Also, FPN did not maintain lists of employees that identified specific

skills or experiences; therefore, the field management team's discussions were based only on personal knowledge from experience working with certain fitters. ((11/12/15 Acred 30(b)(6) Dep Des. 50:24-52:4)). Both Sullivan and Acred testified that the field management team used the rankings in the Field Ratings System chart to assist in layoff decisions during the economic slowdown. (Tr. 888:10-889:17, 897:1-4 (Sullivan); Tr. 1085:20-1086:11 (Acred)). On the September 2008 chart, Martin received a B ranking and Truesdell received a B+ ranking. (JX21.)

A few months later on January 9, 2009, the field management team created yet another "Field Rating" chart. (DX10). For each fitter, the chart reported the fitter's "Position," as foreman, fitter, or apprentice; a letter grade indicating the fitter's "Value"; and a directional arrow indicating the fitter's "Projection/Status"—*i.e.*, an arrow pointing up if the fitter's value was trending upward, horizontally if being maintained and down if trending downward. (DX10; Tr. 1303:7-19 (Hebert)). Acred testified that this chart was also used in making layoff decisions. (Tr. 1025:1-20, 1083:13-23; 1084:1-1085:18 (Acred); PX132; DX10). The January 2009 chart listed both Martin's and Truesdell's positions as foreman. (DX10). Martin received a B- ranking with his status maintaining and Truesdell received a B+ ranking with his status maintaining. (DX10). In September 2009, FPN updated the letter grades in the "Field Rating" chart. Martin's ranking improved to a B and Truesdell's stayed at a B+. (PX133).

FPN did not update or use the ranking charts after 2009. Hebert testified that, as FPN developed its workforce, the supervisors no longer needed to do an in-depth evaluation of each individual fitter and the charts became irrelevant. (Hebert (individual) Dep. Des. 156-157).

Years later around 2011 or 2012, the field management team created a list of interview questions to highlight the criteria the team considered when hiring a new fitter. (JX23; Tr.

13

1040:10-1043:11 (Acred); Tr. 1242:23-1243:23 (Barcik); Tr. 1801:1-11 (Waters); JX23). Acred testified that this list reflected FPN's "new productivity expectations." (Tr. 1040:10-17 (Acred)). Among other things, the list indicated that the team expected a fitter be able to install a minimum 15 sprinkler heads in one day. (JX23; Tr. 1041:24-1042:2, 11-12 (Acred); Tr. 1244:12-14 (Barcik); Tr. 1801:7-20 (Waters)). Barcik testified that the standard has since increased and is now higher than 15 heads-per-day. (Tr. 1244:12-16, 1249:7-10 (Barcik)). Overall, however, Acred admitted that FPN does not actually track heads-per-day productivity by individual fitters. (Tr. 1110:16-20 (Acred)).

In summary, FPN never had a consistent formal practice when it came to hiring or evaluating performance. It is also clear that hiring, transfer, and layoff decisions were made by the superintendent with input from the field management and based on the team members' familiarity with the fitters and their availability. Because there were not objective, consistent standards for evaluation, evidence comparing fitters based on what little recording FPN did do was basically meaningless. Of course, without objective standards, FPN could have made its decisions based on bias and discrimination but the timeline of the Plaintiffs' careers simply do not support that.

## V.    Individual Plaintiffs' Careers

### A.    Plaintiff Kenneth Martin

Plaintiff Kenneth Martin, an African American sprinkler fitter, worked for FPN or its predecessor in the late 1990s, from 2005 to 2009 and again for a few months in 2010. Martin first worked at F.E. Moran Fire Protection starting in 1998. (Tr. 51:7-9 (Martin)). Martin was hired by then-foreman Sullivan, who testified that as he recalls, Martin was "a very good worker." (Tr. 865:11-12 (Sullivan)). Martin similarly testified that he and Sullivan had a "pretty

14

good" working relationship. (Tr. 51:7-52:9 (Martin)). Sullivan hired Martin to work on a job for DisneyQuest—a job which had no minority hiring requirement. (Tr. 51:19-52:2, 148:1-7 (Martin); Tr. 897:13-17 (Sullivan)). Martin testified that he had been hired to replace a white fitter on the job but then could not recall why he had replaced that fitter or who at FPN had told him that. (Tr. 201:1-5, 222:11-224:17 (Martin)). Martin subsequently left his employment with F.E. Moran Fire Protection, though he could not recall whether he was laid off or left specifically to work for another company. (Tr. 51:15-18, 148:1-149:3 (Martin)). Regardless, after leaving Martin worked consistently as a sprinkler fitter for other contractors. (Tr. 52:18-21 (Martin)).

In 2005, Sullivan, now superintendent, again hired Martin to work for F.E. Moran Fire Protection and in 2006 promoted Martin to foreman. (Tr. 52:14-53:15 (Martin)). From 2006 to 2009, Martin worked consistently, averaging 40 hours per week; Sullivan transferred him from job to job and never laid him off. (Tr. 54:9--55:3; 56:4-10 (Martin); Tr. 869:5-12 (Sullivan)). During Sullivan's tenure, FPN had ample job opportunities for fitters, in particular at a series of projects performed for DePaul University. (Tr. 887:8-14 (Sullivan); Hebert 30(b)(6) Dep Des. 195-196)). There were no minority requirements on the DePaul jobs. (Tr. 897:18-20 (Sullivan)).

In 2008 and 2009, Martin worked as a foreman on the DePaul O'Malley Lewis project, a retrofit job at two adjoining high-rise buildings at DePaul's downtown campus. (Tr. 60:13-15, 61:14-15 (Martin); Tr. 920:10-12 (Acred); Hebert 30(b)(6) Dep Des. 195-196). Sullivan was the original superintendent of the O'Malley Lewis project and assigned Martin a minivan when Martin started as foreman on the O'Malley Lewis project. (Tr. 65:14-15 (Martin); Tr. 920:1-4 (Acred); Tr. 1783:18-1784:5 (Waters)). The minivan was not equipped with the same tools as a service truck, which Martin never had. (Tr. 1978:1-9 (Waters)). Sullivan assigned it to Martin as a sort of experiment and FPN never assigned a minivan to any other fitter. (Tr. 1977:17-25

15

(Waters)).  Acred took over as superintendent of the project when Sullivan transferred roles in February 2009.  (Tr. 920:5-9 (Acred)).  As superintendent, Acred assisted Martin whenever he had questions on the job and transferred Martin to other jobs whenever there was a lull in work at the O'Malley Lewis project. (Tr. 147:2-12, 156:1-13 (Martin); JX32.)

The DePaul jobs, including the O'Malley Lewis project, came in under budget and were profitable for FPN.  (Tr. 870:7-13 (Sullivan); Hebert (individual) Dep. Des. 40:7-11).  Martin believed he had performed well on the O'Malley Lewis project because he had received only positive feedback and the work had been completed in fewer hours than budgeted.  (Tr. 66:9-15 (Martin)).  However, FPN attributes the success of the DePaul projects to the bidding and not to the contribution of the foremen like Martin.  (Tr. 1325:5-16 (Hebert)).  Acred, Hebert and Waters testified that the DePaul jobs were bid with plenty of hours and, therefore, obtained at a high margin from the outset. (Tr. 1050:10-18 (Acred); Tr. 1325:7-16 (Hebert); Tr. 1830:18-22 (Waters)).

Martin was laid off on September 10, 2009 when the O'Malley Lewis job ended.  (FPTO, Ex. 1 SOUF ¶ 19; PX25).  There is little evidence as to why or how Martin was laid off in 2009. Martin testified that, after the O'Malley Lewis job, FPN told him that they would call him when they found a job for him but, after waiting and never receiving a phone call, he assumed he had been laid off and filed for unemployment.  (Tr. 218:21-219:8 (Martin)).  Martin's layoff form reports the explanation for his layoff as "lack of work" and lists him as "eligible for rehire." (PX25).  Acred testified that the decision to layoff Martin in 2009 was a "group decision" among the field management team but did not recall any conversations regarding the decision to lay off Martin.  (Tr. 922:1-16 (Acred)).  Waters did not recall anything about Martin's 2009 layoff. (Tr. 1784:23-1785:6 (Waters)).

16

In January 2010, Martin began working for another fire protection company, Universal Fire Protection ("UFP"). (Tr. 86:24-87:9 (Martin)). UFP, a minority-owned company, hired Martin as foreman for the Boone Clinton project, the construction of a new school for Chicago Public Schools. (Tr. 86:10-87:25 (Martin)). Martin faced several challenges beyond his control while working for UFP on the Boone Clinton project including that UFP failed to timely deliver pipes to the worksite and the pipes that were delivered were poorly fabricated. (Tr. 90:13- 95:5 (Martin); PX0023). These challenges caused delays in installation and, ultimately, leaks in the sprinkler system installed. (Tr. 191:1-7 (Martin)). Martin recorded these issues in his daily construction log. (Tr. 89:10-12, 90:3-22 (Martin); PX23).

FPN took over the Boone Clinton subcontract in June 2010 after UFP went out of business. (Tr. 94:6-10 (Martin); 11/11/15 Hebert 30(b)(6) Dep. Des. 122:3-21). By June 2010, the project was about 75% complete but behind schedule; FPN agreed to assist the general contractor "out of a jam" in meeting its strict deadline in exchange for potential "fortunate returns." (Tr. 1324:6-14, 1350:11-21 (Hebert); PX200). Because UFP had already installed much of the sprinkler system, FPN negotiated provisions in its contract with the general contractor stating that FPN agreed only to provide labor to assist in completing the project and was otherwise not responsible for any of UFP's contractual obligations and not liable for the performance and reliability of the sprinkler system. (Tr. 1266:13-1269:2, 1327:11-1328:12 (Hebert); JX27).

Hebert recommended that Acred retain Martin as foreman for the Boone Clinton for continuity purposes. (Tr. 1353:21-1354:9 (Hebert); PX200). Acred agreed and hired Martin as foreman. (Tr. 1033:11-18 (Acred)). Hebert then submitted a schedule for completing the job to the general contractor and discussed this schedule with Martin. (Tr. 1323:25-1324:16 (Hebert);

JX4). Hebert described the schedule as one FPN "could easily meet" because it included added "fluff" time for unexpected issues. (Tr. 1324:6-14 (Hebert)). The schedule budgeted 639 hours and aimed for substantial completion by August 6, 2010. (JX4). Martin completed the job on time in August 2010 but used approximately 1,360 hours of labor—more than double the budgeted total. (Tr. 94:18-21 (Martin); JX34).

Martin was laid off on August 9, 2010 when the Boone Clinton job ended. (Tr. 94:20-95:16 (Martin); PX26). Again, Acred testified that the decision to layoff Martin in 2010 was a group decision among the field management team. (Tr. 932:24-933:4 (Acred)). Martin's 2010 layoff form reports the explanation for his layoff as "lack of work" and lists him as "eligible for rehire." (PX26). Following his layoff, Martin reached out to FPN a few times to inquire about work: twice to Acred in September and October 2010 and once by email to Hebert in December 2010. (Tr. 99:18-101:2 (Martin); DX27). Acred responded both times by saying that he had Martin's number and Hebert told Martin that he would let the superintendents know of his inquiry. (*Id.*) However, Hebert also testified that following the Boone Clinton project, he would not have recommended Martin to be a foreman. Hebert explained, "I had a soft spot for Kenny . . . but business is business and, you know, certain people possess certain skill sets and other folks don't." (Tr. 1343:21-1344:1 (Hebert)).

After Martin's layoff, FPN had to fix six leaks in the Boone Clinton sprinkler system. (DX27). Hebert testified that Martin failed to notify FPN of any problems with the piping until after he had been laid off. (Tr. 1322:7-15 (Hebert)). However, it is reasonable to imagine based on the liability releases FPN negotiated before taking the job that FPN at least anticipated potential issues with the Boone Clinton system, regardless of what Martin did or did not tell them at that time.

Following his layoff, Martin enrolled in school at the Elim Outreach Center and took classes to become a certified nurse assistant, certified phlebotomist and dialysis technician. (Tr. 42:12-23; 103:5-11, 205:25; 206:1-15 (Martin)). In 2010 and 2011, Martin attended school for nine to twelve months and completed a one-month internship. (Tr. 206:8-15 (Martin)). Martin testified that he was still seeking employment as a sprinkler fitter at this time but could not recall whether he actually contacted any sprinkler fitter companies regarding job opportunities during the period he was in school. (Tr. 206:16-20 (Martin)). After completing school, Martin worked as a patient care tech for DaVita Dialysis Center from July 2011 until being discharged in August 2012. (Tr. 103:22-104:35, 206:21-207:4 (Martin)). Martin applied for jobs with several sprinkler fitter contractors while working for DaVita and eventually found employment. (Tr. 106:12-18, 111:15-25 (Martin)).

Martin worked from 2005 to 2009 under Sullivan and then Acred, during which time he was promoted and never laid off. The industry began to slow in late 2008 and early 2009 and FPN had fewer jobs. The last job Martin worked in 2009 was the DePaul O'Malley Lewis project. When there was a lull on that job, Acred transferred Martin to other jobs to keep him busy. But when the O'Malley Lewis project ended, FPN had no other jobs that needed additional fitters. FPN told Martin they would call him if work became available but it never did. Within a few months, Martin found work with UFP and was not available for rehire by FPN. In 2010, UFP went out of business and FPN took over some of their jobs including the Boone County job. FPN kept Martin on as foreman of the Boone County job for continuity's sake. FPN knew the Boone County job had problems before taking it over and negotiated releases of liability for any issues caused by UFP's work. With Martin's help, FPN submitted a schedule and labor cost estimate to finish the job. Martin completed the job on time but far

exceeded the labor hours budget, costing FPN money.  After Boone County, FPN laid off Martin and did not transfer him to another job.  Martin contacted FPN a few times to inquire about work but was not rehired.  Soon after being laid off, Martin enrolled in school and never called FPN again about work opportunities.

### B.    Plaintiff Aaron Truesdell

Plaintiff Aaron Truesdell, an African American sprinkler fitter, worked for FPN or its predecessor from 2006 to 2009 and again for a few months in 2010.  Sullivan first hired Truesdell to work as a journeyman fitter for F.E. Moran Fire Protection in spring of 2006 and promoted Truesdell to foreman in summer of 2006.  (Tr. 322:16-19, 323:6-7, 20-23 (Truesdell); Tr. 868:11-15 (Sullivan)).  Sullivan hired Truesdell because he had heard Truesdell was a "very good fitter" and "could run work."  (Tr. 868:7-10 (Sullivan)).  Sullivan considered Truesdell to be a responsible, trustworthy worker with "very good" communication skills that performed well on the jobs to which he was assigned.  (Tr. 868:17-869:4 (Sullivan)).  Truesdell likewise described Sullivan as an "excellent communicator" and a "trusted" and "fair" supervisor with whom he had a "very good" working relationship.  (Tr. 326:20-327:19 (Truesdell)).

During his tenure as superintendent, Sullivan transferred Truesdell from job to job and never laid him off.  (Tr. 869:5-9 (Sullivan)).  When no foreman positions were available, Sullivan assigned Truesdell to jobs to assist on jobs as a journeyman.  (Tr. 328:20-329:10 (Truesdell)).  When Acred became superintendent in 2009, he also transferred Truesdell to various jobs both as foreman and as journeyman and when Truesdell worked as journeyman, he maintained his foreman wage rate.  (Tr. 328:20-329:10, 398:25-399:6, 450:8-16 (Truesdell)).

Between 2006 and 2009, Truesdell worked as a foreman on projects for DePaul and the Chicago Mercantile Exchange (CME).  On the DePaul O'Malley Lewis project, Martin was head

foreman but Truesdell ran the night crew as foreman two or three times when they worked through the day and night. (Tr. 329:11-22 (Truesdell)). As foreman on the CME project, an add/relocate job on two floors of the building, Truesdell oversaw six to ten fitters at any time. (Tr. 329:23-330:11 (Truesdell)). Both projects were profitable for FPN. (Tr. 330:12-23 (Truesdell); Tr. 1403:10-24 (Metcalfe); Hebert (individual) Dep. Des. 33:2-19)). Neither had any minority hiring requirements. (Tr. 897:18-20 (Sullivan); Tr. 1220:4-5 (Barcik)). During a foreman meeting in 2009, Metcalfe singled Truesdell out for good performance, praising him for his "excellent" work on the CME job and noting that the job was "very profitable for the company." (Tr. 330:12-23 (Truesdell); Tr. 1403:10-24 (Metcalfe)).

The Chase Bank project in downtown Chicago was Truesdell's last job before being laid off in 2009. There were no minority hiring requirements for the job. In July 2009, Acred transferred Truesdell to the Chase Bank job to replace a white fitter, Randy Iverson, as foreman. (Tr. 334:10-24, 410:15-411:1 (Truesdell); JX34). Acred testified that he would not remove the foreman on a job as it was winding down unless the foreman was not performing. (Tr. 1047:8-11 (Acred)).

Truesdell remained on the job until it was complete at the end of July. (Tr. 334:14-18, 335:16-17 (Truesdell)). Upon completing the job, Truesdell went on a 10-day vacation to California which he had cleared with his supervisors. (Tr. 335:16-24, 336:19-21 (Truesdell)). When he returned, Waters informed him that he was being laid off. (Tr. 334:24-335:12 (Truesdell)). Truesdell felt "blindsided and hurt" and "stunned." (Tr. 336:13-337:19 (Truesdell)). Truesdell admitted that, to his knowledge, there were no job opportunities at FPN for fitters the time of his layoff in 2009. (Tr. 337:20-23 (Truesdell)).

After his 2009 layoff, FPN tried to rehire Truesdell twice but he declined. Truesdell began working as a sprinkler fitter at UFP around late October or November 2009. (Tr. 340:15-22 (Truesdell)). In December 2009, Waters called Truesdell and asked if he would be interested in a job opportunity at FPN. (Tr. 344:12-345:2 (Truesdell)). Truesdell told Waters he was working for UPN and appreciated the offer but declined. (Tr. 344:23-345:2 (Truesdell)). In February 2010, Barcik called Truesdell again about returning to work for FPN. (Tr. 345:3-18 (Truesdell); Tr. 1138:15-21 (Barcik)). Barcik told Truesdell that he could take a couple of weeks to decide. (Tr. 345:8-18 (Truesdell)). Barcik testified that it was unusual for him to reach out to fitters about work and that he could not remember any other instance when he did so. (Tr. 1139:1-9 (Barcik)). Truesdell did not immediately accept the job. He explained that the owner of UPN was a minority and he wanted to give him a "fair shake" because, being a minority himself, he would have taken pride in helping to make the business a success. (Tr. 345:19-25 (Truesdell)). FPN's attempts to rehire Truesdell were not related to any minority hiring requirement. (Tr. 1222:19-22 (Barcik)). Acred testified that Truesdell had an "open invitation" to return to FPN. (Tr. 1053:25-1054:7 (Acred)).

Truesdell eventually contacted Barcik to accept the offer in April 2010, in part out of concern for UPN's financial condition. ((Tr. 346:10-25; 347:1-7, 415:3-21 (Truesdell)). FPN rehired Truesdell as a journeyman within a week or two and assigned him to the Lee Pasture job, a new construction Chicago Public School on the 4700 block of West Marquette Road. (Tr. 347:8-18, 396:11-13, 415:22-24 (Truesdell)). Although several FPN witnesses testified that the Lee Pasture job had no minority hiring requirement, the subcontract and other documents suggest that it did. (PX146; PX162; PX163.) Acred was the superintendent on the Lee Pasture job and promoted Truesdell to foreman after the previous foreman, a white fitter named Bill Cartright,

was removed for poor performance. (Tr. 412:18-413:25 (Truesdell); Tr. 935:4-6, 1054:8-1055:11 (Acred); Tr. 1221:12-17, 1222:8-15 (Barcik)). At that point, the Lee Pasture job was pretty far along. (Tr. 1222:13-15 (Barcik)).

After the Lee Pasture job, Truesdell worked at the Matteson Community Center, a recreation center in Matteson, Illinois, near where Truesdell lived in Park Forest and, therefore, was convenient for Truesdell to get to work. (Tr. 350:6-20, 379:25-380:5, 455:21-456:1 (Truesdell)). The Matteson job had a minority hiring requirement. (PX315; FPTO, Ex. 1 SOUF ¶ 46). Following the Matteson job and for the majority of the summer of 2010, Acred assigned Truesdell to work as foreman on a Walmart job in Chicago's Austin neighborhood. (FPTO, Ex. 1 SOUF ¶ 43; PX139; PX286). The Walmart subcontract did not include a minority requirement; however, certain communications suggest FPN nonetheless committed to provide 50% minority labor. (Tr. 1331:22-1332:20 (Hebert)); Tr. 1058:22-24 (Acred); Tr. 1819:7-17, 1821:12-25 (Waters); JX26; PX139; PX155.)

The Walmart job involved a buildout of an existing store and proceeded in three phases, the last of which was the largest and made up the bulk of the work. (Tr. 353:7-18, 355:8-9 (Truesdell)). As foreman, Truesdell attended weekly foreman meetings in which the general contractor discussed the schedule and expected pace for the job. (Tr. 325:21-326:2, 357:1-10, 358:13-16 (Truesdell)). Truesdell worked to complete the Walmart job on schedule. (Tr. 358:17-22 (Truesdell)). He completed the first phase on his own and requested assistance on the second phase; Acred provided an apprentice. (Tr. 355:15-355:6 (Truesdell)). Truesdell took his regular vacation in August and FPN fitter Ignacio Torres filled in while he was gone. (Tr. 356:4-13 (Truesdell)). When he returned, Truesdell requested additional help for the third phase. Given the scope of the work and the general contractor's schedule, he believed he needed at least

23

two journeymen to assist him and the apprentice. (Tr. 356:13-358:12 (Truesdell)). Acred agreed that Torres could remain on the job but assigned no one else. (Tr. 358:19-22 (Truesdell)).

Toward the end of the third phase, Acred approached Truesdell for the first time about number of hours worked on the job and expressed concern that the hours were running out. (Tr. 358:23-360:13, 417:8-25 (Truesdell)). Neither Acred nor anyone else at FPN ever complained that Truesdell did unauthorized work outside the scope of the job. (Tr. 360:21-361:2 (Truesdell)). The total hours worked on the Walmart job nearly doubled the budgeted hours. (Tr. 1062:3-20 (Acred)). Acred blamed the hours issues on the salesperson for underbidding the job and on the foreman for failing to track hours and be efficient. (Tr. 1062:3-20, 1107:6-21 (Acred)); Tr. 1820:22-1821:7 (Waters)). Acred laid off Truesdell on September 29, 2010, the day he was scheduled to finish the Walmart job, for lack of work. (Tr. 352:23-25; 367:16- 25; 368:11-15 (Truesdell); Tr. 1064:10-14 (Acred); JX19). Truesdell's Notice of Termination indicates that he was eligible for rehire and that FPN had not needed to hire anyone to replace him. (JX19; Tr. 457:6-25, 458:1-3 (Truesdell)). FPN had no jobs to transfer him to at the time of his layoff. (Tr. 1814:9-12 (Waters)). FPN also fired the sales representative from the Walmart job.

FPN held an After-Action meeting in October 27, 2010 to discuss and create a report documenting various failures on the Walmart job. (Tr. 937:14-21, 1060:21-25; 1061:1 (Acred); Tr. 1758:23-25, 1759:1-2, 1814:3-8, 1823:9-18 (Waters); JX29). FPN only conducts After-Action meetings for projects that go "really bad." (Tr. 1060:16-1061:20 (Acred)). The After-Action Report listed the issues that contributed to the "failure" of the Walmart project and included four main categories: (1) "Turnover," (2) "No designer assigned to project," (3) "Wrong foreman running project," and (4) "lack of leadership." (JX29). Under the third

category, the report states that there was "poor communication" and that the foreman "didn't care about the hours" and "continual [sic] did work outside of scope, without authorization." (JX29; Tr. 1061;16-1062:2 (Acred); Tr. 1823:9-1824:1 (Waters)). The Report also blamed the salesperson' inexperience and failure to properly communicate the scope of the project when turning it over to the field management team as well as the lack of phasing schedule and designer. (JX29; Tr. 937:22-938:10 (Acred)). Metcalfe testified also that Walmart was one of the most difficult clients FPN ever worked with. (Tr. 1525:25-1526:2, 1526:20-1528:2 (Metcalfe)).

Truesdell testified that he was still interested and available for work following his 2010 layoff. However, Truesdell also admitted that he never contacted a supervisor or anyone else at FPN for work until 2012 when he returned a phone call from Waters. (Tr. 372:6-22, 420:16-421:4; 453:17- 454:6 (Truesdell)). Truesdell never had a service truck during his employment with FPN. (Tr. 1805:4-6 (Waters)).

Truesdell worked from 2006 to 2009 under Sullivan and then Acred, during which time he was promoted and never laid off. Both Sullivan and Acred transferred Truesdell to work as a journeyman on jobs when no foreman jobs were available and allowed him to maintain foreman pay. The last job he worked in 2009 was at Chase Bank. When the job ended, FPN could not have transferred him because Truesdell immediately went on a ten-day vacation. When Truesdell returned, there were no jobs available and he was laid off. Following his 2009 layoff, Truesdell did not reach out to FPN about rehire; in fact, between December 2009 and April 2010, Truesdell declined FPN's offers to return. Truesdell eventually accepted the offers for rehire. Upon return, he worked as foreman on the Walmart project which FPN considered a "failure." Truesdell was laid off and not transferred after the Walmart ended. Following his 2010 layoff,

Truesdell never contacted FPN for work other than returning Waters' phone call in 2012. Truesdell never made any internal complaints of hearing race-based comments or of unfair or unequal treatment. He also testified that other than his 2009 layoff, Truesdell never felt like he was being treated unfairly by anyone including Scott Acred. (Tr. 392:19-22, 404:16-18, 411:3-5 (Truesdell)).

### C.     Plaintiff Johnny Tejada

Plaintiff Johnny Tejada, a fitter of Panamanian ancestry who identifies as African American, worked for FPN for a few months in 2010. Before working for FPN, Tejada worked for two years for UFP and was not laid off at any point during that time. (Tr. 758:22-759:4 (Tejada)). UFP promoted Tejada from journeyman to foreman and assigned him as the original foreman to the Adam Clayton Powell School project. (Tr. 762:4-12, 763:6-7 (Tejada)). Tejada waived the higher foreman's wage rate and accepted the journeyman pay rate on the Powell School job because UFP was having financial issues at the time; he was not aware of any other foreman that did the same. (Tr. 764:23-765:9, 808:17-18 (Tejada)). UFP went out of business before the Powell School project was completed. (Tr. 766:1-9 Tejada)).

FPN took over the Powell School project from UFP near the end of June 2010. (JX24; PX215). The job stood stagnant for a few weeks and then started up again in early July. (Tr. 766:1-9 (Tejada)). When FPN took over, Sollitt, the general contractor on the job, recommended that Acred reach out to Tejada about continuing to work on the project for FPN. (Tr. 1142:21-25 (Barcik)). Acred hired Tejada on June 28, 2010 but assigned Eric Woolwine to take over as foreman on the Powell School job. (Tr. 1065:21-25 (Acred); Tr. 772:17-773:2 (Tejada); Tr. 1337:8-1339:6 (Hebert); JX25.) After being hired, Tejada worked for a short period on the

Boone Clinton project under Martin, who was foreman on the job, until the Powell School job started again.  (Tr. 814:2-13; 815:2-816:2 (Tejada)).

Tejada testified that, when he was hired, he knew FPN planned to assign another fitter to the Powell School job but assumed he would continue as foreman.  (Tr. 769:21-770:19, 816:24-817 (Tejada); PX71).  He testified also that he was not aware of any minority hiring goals or requirements on the Powell School job and did not feel that FPN was obligated to hire him based on his race. (Tr. 817:6-15, 825:11-13 (Tejada)).  Indeed, Hebert negotiated any EEO minority goals and requirements out of the agreement with Sollitt when FPN took over the project from UFP.  (Tr. 1333:15-21 (Hebert); PX0215).  Hebert told Sollitt that FPN would "try to assist" with minority requirements but maintained that FPN would not assume liability or accept any penalties if they were not met.  (JX24).  Hebert negotiated other exclusions as well, including any warranty for work installed by UFP prior to FPN taking over.  (PX215; Tr. 1332:22-1335:9 (Hebert)).

Tejada and Woolwine worked together on the Powell School job for two to three months. (Tr. 774:12-14 (Tejada)).  There were never any complaints about Tejada's work on the job but Woolwine was the more productive of the two.  (Tr. 774:18-20 (Tejada); Tr. 942:18-943:5 (Acred)). Tejada installed around 15 heads per day with Woolwine laying out the pipe to assist. (Tr. 1225:9-22 (Barcik)).  Meanwhile, Woolwine, who was known for his high productivity rate, installed more than 23 heads per day on his own.  (Tr. 1225:20-25 (Barcik))

The Powell School project began winding down the week of September 17, 2010.  (Tr. 775:2-5 (Tejada)).  That week, Acred told Tejada that he would not be laid off but would be placed on a "furlough" for about a week before going to a new project.  (Tr. 775:12-17 (Tejada)). Woolwine stayed on the job for several weeks more to complete the testing, trimming and other

aesthetic work, as typically required of the foreman. (Tr. 828:2-13 (Tejada)). Tejada did not hear anything from FPN for two weeks and months later received notice of his termination. (Tr. 776:17-777:24 (Tejada); JX0039). The notice, dated March 24, 2011, listed his last day worked as September 17, 2010, indicated the reason for his layoff was "lack of work" and stated that he was "eligible for rehire." (*Id.*)

Tejada disputes that there was a lack of work in September 2010 when he was laid off. He testified that before he was laid off, Acred told him about a new Walmart construction starting up. (Tr. 828:19-829:6. (Tejada)). Acred could not recall any openings at the time Tejada was laid off and testified that there was no new Walmart project starting at that time. (Tr. 1067:7-8 (Acred)).

Tejada also points to the Ogden Elementary School job, a new construction Chicago Public School, which was starting up in the fall of 2010 when he was laid off. (Tr. 943:25-944:9 (Acred); 1829:17-1840:6 (Waters); JX34). On July 28, 2010, Barcik emailed the FPN safety coordinator to arrange flag training—safety training for flagging vehicles and deliveries onto a job site—and drug testing for Tejada and three other fitters Kevin Sink (Asian), Ignacio Torres (Hispanic) and Bill Massey (White). (PX208). Barcik explained that flag training is not necessarily associated with a certain job because FPN trains fitters in groups for efficiency's sake and typically when work for the fitter is slow. (Tr. 1250:5-18 (Barcik)). Barcik indicated in the email, however, that the drug testing was specifically required by Turner, the general contractor on the Ogden School job. (PX208; Tr. 1145:18-20 (Barcik)) The Ogden School job had a minority hiring requirement. (PX251; Tr. 1151:2-1152:19 (Barcik)). Ultimately, Acred assigned Massey as foreman on the Ogden School job and FPN subcontracted the labor for the job to Profast, a minority-owned business, to meet the minority hiring requirement. (Tr. 1150:14-20,

1151:22-25 (Barcik); 1830:7-14, 1961:4-5 (Waters); PX117). Neither Tejada, Sink nor Torres worked any hours on the Ogden School job; only white fitters recorded any hours for FPN on the job. (JX34; Tr. 1951:14-16 (Waters)).

Tejada never had a service truck or other company vehicle during his employment with FPN. (Tr. 1805:4-8 (Waters); Tr. 805:20-22 (Tejada)). Tejada did not have a valid driver's license when FPN hired him and never obtained one while employed with FPN or after being laid off. (Tr.788:10-24; 790:10-12 (Tejada)). Tejada did not recall whether or not Acred knew he did not have a driver's license. (Tr. 790:5-9 (Tejada)). He did testify, however, that his inability to maintain a drivers' license hindered his ability to obtain work after his layoff from FPN. (Tr. 788:25-789:13 (Tejada)).

Tejada changed his phone number at least twice after his layoff if September 2010 and did not recall ever providing his updated contact information to Acred or anyone else at FPN in case they wanted to reach out to him about job opportunities. (Tr. 809:14-23, 810:1-5, 14-23 (Tejada)). Tejada had Acred's business card but did not attempt to contact him or anyone at FPN until April 2011, months after his September 2010 layoff. (Tr. 823:16-22 (Tejada)). When he did call Acred, it was not to inquire about work but to leave a "paper trail" showing that he had reached out. (Tr. 849: 1-8 (Truesdell)). On April 11, 2011, Tejada received an email sent to a group of individuals including Martin and Truesdell encouraging him to call FPN, let them know he was an African American living in Chicago and looking for work and document the time and person with whom he spoke. (DX132). The email instructed, "[T]ry to do this today. This helps our paper trail." (*Id.*) Tejada called Acred after receiving this email. (Tr. 849:1-8 (Tejada)). He did not talk to Acred directly or leave a message. (Tr. 834:12-22, 849:9-10 (Tejada)). He called

the number on Acred's business card but could not recall whether it was his cellphone or office number. (Tr. 849:11-23 (Tejada)).

At the time Tejada called FPN, he lived three hours away from Chicago and was not eligible for hire by FPN. Tejada moved to Battle Creek, Michigan sometime in 2011. (Tr. 751:4-7, 788:10-14 (Tejada)). While there, he attempted to apply for a fitter job but was denied because he was not in good standing with the Local 281 union. (Tr. 834:24-835:10 (Tejada)). He testified that he stopped making quarterly dues to the union after his layoff in 2010 and that the last union card he recalls having was for 2010. (Tr. 790:17-791:22 (Tejada)). Per union rules, a member that fails to pay dues is not in good standing and not eligible to work as a Local 281 member and, therefore, not eligible for hire by FPN. (Tr. 792:8-25 (Tejada)).

In summary, Tejada failed to make any credible effort to contact FPN for rehire after his layoff in September 2010. FPN could not have reached Tejada even it tried because he had changed his number without notifying anyone at the company. Moreover, as of 2011, Tejada lived more than three hours away from Chicago and was not eligible to work for FPN if a job were available. Finally, Tejada testified at trial that Acred, the only superintendent he worked for at FPN, never treated him unfairly. (Tr. 832:20-22 (Tejada)). Tejada never made any internal complaints of unfair or unequal treatment at FPN. (Tr. 825:14-16 (Tejada)).

## VI.    Other FPN Employees

### A.    Erik Massey

Erik Massey is a white fitter who worked as a foreman for FPN consistently from 2008 through the present. (PX448B; PX450C). Massey had the same skills as Martin and Truesdell and received the same or worse ratings than Martin and Truesdell on the various charts FPN created in 2008 and 2009: weighted rank of 93 and value rank of 2 in the February 2008

"Manpower skills list," a B/C+ in the September 2008 "Field Rating System" chart, a B- with "trending upward" status in the January 2009 "Field Rating" chart, and a B in the September 2009 "Field Rating" chart. (Tr. 951:23-952:8 (Acred); JX22; JX21; DX10; PX133).[2]

Massey worked with Truesdell on the Matteson Community Center job but did not work on any other jobs with any of the Plaintiffs. (JX34). FPN assigned Massey to work on the Kellogg Cancer Center the week ending August 28, 2009, about one month after Truesdell's 2009 layoff; the 2550 N. Lakeview job the week ending August 27, 2010, a few weeks after Martin's 2010 lay off; and the DePaul Loop FP job the week ending October 15, 2010, about two weeks after Truesdell's 2010 lay off. (*Id.*).

FPN gave Massey a service truck but Sullivan subsequently took it away after it was broken into because Massey failed to properly lock the truck in violation of company policy. (Tr. 889:24-890:12 (Sullivan)). Massey also had performance issues on some jobs, including going over the budgeted hours on a Concordia University job and a flood on the 2550 N. Lakeview job. (Tr. 945:7-9, 958:4-12 (Acred)). Barcik testified that another contractor on the 2550 N. Lakeview job was responsible for the flood. (Tr. 1235:16-1238:1 (Acred)).

**B.     William Sulich**

William Sulich is a white fitter who worked as a foreman for FPN consistently from 2008 to 2015. (PX448B; PX450C). Sulich had the same skills as Martin and Truesdell and received similar or better ratings than Martin and Truesdell on the various charts FPN created in 2008 and 2009: weighted rank of 95 and value rank of 2 in the February 2008 "Manpower skills list," an A

---

[2] Martin received the following ratings on the same charts: weighted rank of 81 and value rank of 3, B, B- with "maintaining" status, and B. Truesdell received the following ratings: weighted rank of 84 and value rank of 3, B+, B+ with "maintaining," and B+. (JX22; JX21; DX10; PX133.)

in the September 2008 "Field Rating System" chart, an A with "trending upward" status in the January 2009 "Field Rating" chart, and an A in the September 2009 "Field Rating" chart. (Tr. 851:12-22 (Acred); JX22; JX21; DX10; PX133). Procter testified that in 2008 and 2009, Sulich was a "terrible" fitter and had performance problems on jobs, for example, making mistakes due to ignorance of the sprinkler fitter code including on one site where he installed sprinkler heads at the wrong height and the finished wall had to be broken in order to reinstall the heads. (Tr. 1652:6-1654:23 (Procter)). Barcik testified that in 2009 Sulich was young and inexperienced but improved over time. (Tr. 1157:22-1161:14 (Barcik)).

Sulich worked with Truesdell on the Lee Pasture job but did not work on any other jobs with any of the Plaintiffs. (JX34). FPN assigned Sulich to work on the DePaul Media Center the week ending August 14, 2009, a few weeks after Truesdell's 2009 layoff; the River North Self and the Advocate Trinity jobs each for one day in the week ending August 21, 2009, a few weeks after Truesdell's 2009 lay off; and two different DePaul jobs the week ending September 4, 2009, about one month after Truesdell's 2009 layoff. (*Id.*).

### C.    Dan Hughes

Dan Hughes is a white fitter who worked as a foreman for FPN consistently from 2008 to the present. (PX448B; PX450C). Hughes had the same skills as Martin and Truesdell and received similar or better ratings than Martin and Truesdell on the various charts FPN created in 2008 and 2009: an A- in the September 2008 "Field Rating System" chart, an B with "trending upward" status in the January 2009 "Field Rating" chart, and an A- in the September 2009 "Field Rating" chart. (Tr. 956:11-957:23, 1078:21-1079:2 (Acred); JX22; JX21; DX10; PX133).

Hughes worked on the Lee Pasture and Matteson Community Center jobs and worked under Truesdell on the CME job; he also worked on the Boone Clinton job with Martin. (JX34).

FPN assigned Hughes to work on the Lee Pasture job the week ending September 4, 2009, about a month after Truesdell's 2009 layoff; the Ogden Elementary job the week ending August 13, 2010, the week of Martin's 2010 layoff; the Watersaver Faucet job the week ending August 20, 2010, one week after Martin's 2010 layoff; and the Westeye Midwest job the week ending October 15, 2010, about two weeks after Truesdell's 2010 layoff. (*Id.*). Hughes had some performance issues, for example, a flood occurred on a 2009 Allstate job for which Hughes was the foreman. (Tr. 956:11-957:23, 1078:21-1079:2 (Acred)). Acred testified that, as Hughes explained to him, the building engineer and not Hughes caused the flood by failing to drain the proper system. (*Id.*)

### D. Randy Iverson

Ryan Iverson is a white fitter who worked as a foreman for FPN consistently from 2008 to February 2014. (PX448B; PX450C). Iverson had the same skills as Martin and Truesdell and is not listed on the various ranking charts FPN created in 2008 and 2009. (Tr. 949:11-19 (Acred); JX22; JX21; DX10; PX133).

Iverson was the foreman on the Chase Bank job before Truesdell; he also worked on the Matteson Community job but did not work on any other of the same jobs as Truesdell or Martin. (JX34). FPN assigned Iverson to work on the Bestway job the week ending September 11, 2009, the week of Martin's 2009 layoff and the 2nd floor N&S job the week ending August 27, 2010, two weeks after Martin's 2010 layoff. Iverson was removed from several jobs as foreman, for example, from the Advocate Trinity job by request of the FPN salesperson after he drilled a hole in the wall and hit a conduit and the Skokie Hospital job by request of the client after setting off a fire alarm while the hospital was occupied. (Tr. 926:16-927:7, 950:1-:951:11 (Acred)).

Iverson was ultimately laid off due to attendance and tardiness issues. (Tr. 950:1-15 (Acred); Tr. Tx. 1407:10-14 (Metcalfe)).

E.    **Eric Woolwine**

Eric Woolwine is a white fitter who worked as a foreman for FPN consistently from 2010 to October 2013. (PX448B; PX450C). Woolwine worked as foreman over Tejada on the Powell School job; he also worked on the Matteson Community Center job. (JX34). FPN hired Woolwine based on his reputation in the fitter industry. (Tr. 1782:16-1783:1-9, 1826:22-1828:3 (Waters)). He was known as "Eric Awesome" and while at FPN maintained a high productivity rate and high quality of work. (Tr. 1066:1-25 (Acred), 1224:22-1225:8 (Barcik)).

F.    **Other African American Fitters**

FPN has hired or rehired two African Americans besides Plaintiffs since 2008. FPN hired African American fitter James Pikes in January 2010; he was laid off in July 2010. (JX33). In July 2011, FPN rehired Anthony House, an African American fitter it had laid off in June 2008. (*Id.*).

VI.    **Race-Based Statements**

Metcalfe testified that he had heard fitters use the word "nigger" on job sites but could not recall any specific examples. (Tr. 1449:13-15 (Metcalfe)). He recalled one instance in which he learned that an employee at headquarters had used the word "nigger" in an altercation with an African American employee. (Tr. 1449:20-1450:1, 1504:9-1505:2 (Metcalfe)). Metcalfe suspended the individual, wrote a report and ultimately terminated him for violating company policy. (Tr. 1505:9-16 (Metcalfe)).

Acred admitted that he used the phrase "nigger-rigged" once 15 years ago in 2002 or 2003 while restoring a car in his garage and that only his personal friend was present at the time.

34

(Tr. 958:13-959:13, 1049:9-21, 1119:23-1121:7 (Acred)). Acred acknowledged the term could be disparaging to African Americans. (Tr. 959:14-17 (Acred)). Acred never used the term again including at work or in front of other FPN employees. (Tr. 1049:22-1050:2 (Acred)). Acred laid off his own brother in 2005, did not rehire him until 2012 and subsequently laid him off again. (Tr. 1100:24-1102:11, 1121:21-1122:4 (Acred); JX33). Acred laid off his brother due to lack of work and because there were better fitters to take the available jobs. (Tr. 1101:11-18 (Acred)). Acred had to support his brother for three years as a result. (Tr. 1101:23-1102:5 (Acred)).

Plaintiffs never heard Acred or anyone else make a race-based statement in the workplace. (Tr. 145:9-20 (Martin); Tr. 404:19-405:22 (Truesdell); Tr. 832:14-16, 23-25 (Tejada)). Sullivan never heard any race-based comments while at work, including from Acred, Waters, Barcik or Metcalfe. (Tr. 892:1-10, 16-21 (Sullivan)).

Procter testified for the first time at trial that he once heard Waters state he "was tired of lazy niggers." (Tr. 1639:11-14, 1641:7-14 (Procter)). Procter—whom Waters had demoted while at FPN—could not recall exactly when between July 2008 and January 2009 he heard Waters make this statement but testified that Sullivan and Acred had been present. (Tr. 1640:15-1641:3, 1677:23-1678:3 (Procter)). Both Sullivan and Acred testified they had never heard Waters say such a thing. (Tr. 2009:25-2010:2, 2017:23-2018:3, 2018:13-17 (Sullivan); 2014:3-7 (Acred)).

## VIII.   Racially Offensive Emails

Plaintiffs presented various racially offensive emails sent and/or received by FPN personnel between 2009 and 2012. The emails violated FPN's anti-harassment policy which prohibits "ethnic slurs or racial epithets, name-calling, jokes . . . and other conduct based on a

person's . . . race" and its computer policy which similarly prohibits emails "consisting of ethnic slurs, racial epithets, or anything that may be construed as illegally harassing or offensive to others based on an individual's race . . . ." (JX38). The emails primarily involved either superintendent Acred or FPN President Metcalfe and Armon executives. None of the emails presented mentioned or made reference to the individual Plaintiffs.

### A. Emails To/From Acred

Superintendent Acred received and sometimes forwarded racially offensive emails on his work email address. On November 11, 2009, Acred received an email from Corey Misch, a former FPN foreman, which stated:

> **Governments, business and colleges have engaged in discrimination against white folks – with affirmative action, contract set-asides and quotas -- to advance black applicants over white applicants.** . . .
>
> **Is white America really responsible for the fact that the crime and incarceration rates for African-Americans are seven times those of white America? Is it really white America's fault that illegitimacy in the African-American community has hit 70 percent and the black dropout rate from high schools in some cities has reached 50 percent?** . . .
>
> This needs to be passed around because, this is a message everyone needs to hear!!! **OK………will you pass it on? YES. I did but will you? Because I'm for a better America**.

(PX230 (emphasis in original)). On November 13, 2009, Acred forwarded the email to Waters and Barcik, who were on the field management team at that time, with no text in the body of the email. (*Id.*) At trial, Acred did not recall the email. (Tr. 997:13-15 (Acred)). He testified that the email "could be offensive" and that he did not agree with its message but admitted that he did not express any disagreement when he forwarded it to Waters and Barcik. (Tr. 999:13-20, 1002:7-1003:25 (Acred)). Acred did not discipline Misch, his subordinate, for sending the email or instruct him not to send emails of this kind. (Tr. 1006:5-10 (Acred)).

On August 21, 2009, Acred received an email from Timothy Carroll that stated:

I don't think being a minority makes you a victim of anything except numbers. The only things I can think of that are truly discriminatory are things like the United Negro College Fund, Jet Magazine, Black Entertainment Television, and Miss Black America. . . .

If you agree, pass this on, if not delete.

(PX367). On August 22, 2009, Acred forwarded the email to Waters and Barcik. (PX367). At trial, Acred testified that he did not recall the email and that he does "not necessarily" agree with its message. (Tr. 1009:14-24 (Acred)).

On January 15, 2010, Acred received another email from Timothy Carroll which stated,

[S]omewhere between 1968 and bill clinton commonsence was lost and or replaced with entitlement the rise of the minorities has led to the decline of our basic principles threw which kept america strong in every way.

(PX366). Acred testified that he did not agree with the email's message. (Tr. 1012:15-17 (Acred)). Acred never responded to Carroll or told him the emails were inappropriate. (Tr. 1012:18-21 (Acred)).

On September 20, 2009, Acred received via email a joke from a friend with the image of a Google search box with the text "white people stole my car" inside and the response line below "Did you mean: **_black_** people stole my car?" (PX383 (emphasis in original)). Acred did not respond or tell his friend the joke was offensive or discuss the email with his friend in any way. (Tr. 1014:8-14 (Acred)).

In February 2012, a FPN sales representative emailed Acred and an FPN technician concerning a contractor's request to report hours worked by minority fitters on a project for an upcoming EEO audit. (PX173). The sales representative stated, "We knew about this all along! We just needed to put a black face on Chris Pell," a white fitter. (*Id.*) Acred did not respond to

the email. (*Id.*) At trial, Acred testified that he did not recall receiving the email and was not sure what "black face" meant. (Tr. 1020:21-1021:5 (Acred)). Acred did not report the email to anyone at FPN. (Tr. 1021:6-7 (Acred)).

**B.      Emails To/From Metcalfe and Armon Executives**

FPN President Metcalfe sent and received numerous racially offensive emails to and from Brian Moran, president of Armon; Richard Lightfine, then-manager of business development for Armon; and Richard Carlini, former president of F.E. Moran Mechanical Services, a subsidiary of Armon. (Tr. 1398:25-1399:11, 1399:22-1400:6 (Metcalfe)). Metcalfe never reported Moran, Lightfine or Carlini for circulating inappropriate and offensive emails. (Tr. 1531:9-1532:5 (Metcalfe)). Metcalfe could not have taken any disciplinary action against Moran, Lightfine or Carlini: Metcalfe reported to Moran and neither Lightfine nor Carlini were ever employed by FPN. (Tr. 1399:22-1400:6, 1487:2-5, 1508:16-24 (Metcalfe)). Moran, Lightfine and Carlini never made any employment decisions about Plaintiffs or any other fitters. (Tr. 1490:3-5, 1493:3-8, 1497:7-9 (Metcalfe); Tr. 896:1-22 (Sullivan); Tr. 1811:10-20 (Waters); Tr. 1033:1-3 (Acred); Tr. 1319:10-15 (Hebert)).

On October 27, 2008, Moran forwarded an email to Metcalfe, Lightfine and Carlini with the subject line "Obama, Your Pastor, Same-Sex & Child Sacrifice" that related to Barack Obama's race for president. (PX236). Metcalfe responded to Moran, Lightfine and Carlini complaining about a forthcoming book by William Ayers "that blames white European descent people for all of the woes in American" . . . "basically calling for open season" on white people. (PX236; Tr. 1452:10-17, 1454:14-1456:1 (Metcalfe)).

On February 2, 2009, Lightfine forwarded an email to Metcalfe and Carlini which stated, "EVERYONE JUST RELAX!!  When was the last time you saw an African-American keep a

38

job for four years?" (PX227).  Metcalfe did not respond to the email; he testified that he did not recall the email and did not report Lightfine for sending the email.  (PX227; Tr. 1459:10-16 (Metcalfe)).

On March 9, 2009, Lightfine forwarded an email to Metcalfe and Carlini with the subject line "White Pride! VERY TRUE."  (PX237).  The forwarded email concluded "***BE PROUD TO BE WHITE!*** It's not a crime YET **. . . but getting very close!  It is estimated that ONLY 5% of those reaching this point in this e-mail, will pass it on.**"  (*Id.* (emphasis in original)).  Metcalfe forwarded the email stating, "Guess I'm one of the 5%."  (*Id.*)  At trial, Metcalfe testified that he found the email distasteful and offensive and responded only "rhetorically." (Tr. 1470:20-1471:2 (Metcalfe)).  Lightfine forwarded the same email again on June 22, 2009, this time with the subject line "racist?"  (PX345).  Metcalfe did not forward the June 22 email or report Lightfine.  (Tr. 1473:13-20 (Metcalfe)).  Metcalfe did not respond to the email but testified that he recalled telling Lightfine to "knock it off."  (Tr. 1473:13-23 (Metcalfe)).

Also on March 9, 2009, Lightfine forwarded an email to Metcalfe, Moran and Carlini about the introduction of a bill to establish a commission to study reparation proposals for African Americans.  (PX238).  Metcalfe responded to the group, "Um, this is a joke, right?" to which Lightfine replied, "Nope . . . are you surprised?"  (*Id.*)  Metcalfe responded again, "No, but 'disgusted', 'fed up' and 'YGBSM!' are words that I would use."  (*Id.*)

On March 21, 2009, Moran forwarded an email to Metcalfe, Lightfine and Carlini with the same message as the email Acred would later forward to Waters and Barcik in November 2009 regarding the disadvantages to whites from affirmative action and the incarceration and dropout rates among African Americans.  (PX229; PX230).  The email ended with, "This needs

to be passed around because, this is a message everyone needs to hear!!!" and Metcalfe forwarded the email with no text in the email body. (PX229; Tr. 1477:25-1478:9 (Metcalfe)).

On May 7, 2009, Carlini forwarded an email to Metcalfe and Lightfine that called for the impeachment of Nancy Pelosi stating, "When asked how these new tax dollars would be spent, she replied: '**12 million illegal immigrants** in our country who need our help along with millions of unemployed minorities . . .' (**Read that quote again and again and let it sink in.) 'Lower your retirement, give it to others who have not worked as you have for it.'**" (PX349 (emphasis in original)). Metcalfe testified he did not recall seeing this email or whether he responded to Carlini. (Tr. 1464:14-17 (Metcalfe)).

On September 9, 2009, Lightfine forwarded an email to Metcalfe and Carlini that tastelessly joked about Hurricane Katrine and the response by the African American residents of New Orleans. (PX241). Metcalfe forwarded the message with no text in the body of the email. (*Id.*) Metcalfe did not express disapproval of the joke in his forwarded email and did not report Lightfine for sending the joke. (Tr. 1480:1-9 (Metcalfe)).

On March 8, 2011, Armon CFO Joe Larson sent an email to Metcalfe, Carlini, Moran and other F.E. Moran employees stating "So now im brians little African-American boy?" referring to an attached image of a native tribe circulated among Armon executives. (PX231). Metcalfe testified that he does not recall seeing this email and admitted that the term "boy" as used in the email is derogatory. (Tr. 1484:9-1485:2 (Metcalfe)).

On January 13, 2012, Moran sent a Washington Post article to the Armon "Executive Team" which included General Counsel Jay Marcus and CFO Larson and copying other individuals. (PX364). The article complained that Obama did not deserve to become president stating "Let that sink in: Obama was given a pass – held to a lower standard – because of the

color of his skin." (*Id.*)  Moran sent the same article to the Executive Team, Lightfine and others again on October 9, 2012.  (PX348).

### C.  Emails Related to Minority Hiring Requirements

Plaintiffs also presented emails between FPN executives, superintendents, project managers and/or sales representatives expressing a general hostility toward affirmative action and minority hiring requirements.  For example, on February 29, 2012, a sales representative emailed Hebert regarding the EEO hiring requirements for a Dunkin Park project and Hebert responded, "Hmmmm……this eeo and mbe crp is a killer."  (PX384).  But Hebert provided further context to this email at trial.  He testified that the Dunkin Project had only a small amount of labor hours and that it is nearly impossible to meet a minority goal on a job that size where only one fitter is necessary because it required that one person work one or two days before being swapped out with someone else.  (Tr. 1288:14-1289:8, 1315:6-1317:2 (Hebert)).  As a result, there is no continuity and FPN loses money.  (*Id.*)

On May 23, 2012, a sales executive emailed Metcalfe, Hebert, Acred, Barcik and other FPN employees regarding a Nash Elementary project stating "NOW the good news! There are no M/WBE, City Resident, Minority Workforce, Women Participation, etc. YAY!!!"  (PX379).  Also, in December 2010, a FPN purchasing agent sent an email to Hebert in which she called Ram Fire Protection, a Certified Minority Business Enterprise, a "certified lazy minority." (PX388).  Hebert testified that he did not recall receiving the email and admitted that he did not tell the purchasing agent, who reported directly to him, that he disapproved of the email or report the email to Metcalfe or Human Resources.  (Tr. 1285:2-21 (Hebert)).

## VIII. Dr. Destiny Peery

Plaintiffs presented social psychological expert Dr. Destiny Peery to opine about the potential relevance of implicit bias to this case. (Tr. 238:16-21 (Peery)). Dr. Peery is an Assistant Professor of Law at Northwestern University and has an extensive background in social psychology as it relates to legal doctrine and practice that qualified her to provide testimony related to the psychology of a corporate culture of discrimination and people's susceptibility to implicit bias.[3]  Dr. Peery based her opinions and testimony on her review of relevant literature, her experience as a social psychologist, and a study of email and deposition testimony produced by FPN during discovery.  (Tr. 238:22-239:7 (Peery)).  Dr. Peery explained that in her review, she explored the concepts of explicit bias, stereotyping, aversive racism and social tuning, all of which are interrelated and under the umbrella of implicit bias.  (Tr. 239:17-24 (Peery)).

Dr. Peery explained that humans have a dual model of cognition whereby the brain process information through both automatic and deliberate processes and that implicit bias refers to biases that arise from the more automatic or spontaneous part of a person's cognition. (Tr. 240:22-24 (Peery)).  She testified that, although implicit bias operates relatively automatically, an individual can be aware of implicit bias and prevent such biases from influencing decision making.  (Tr. 240:18-22 (Peery)).  In other words, an individuals' behavior can be intentional even if the activation of certain information influencing those behaviors is not.  (Tr. 302:130-20 (Peery)).  Dr. Peery testified that implicit bias is "remarkably" resistant to change.  (Tr. 241:11-24 (Peery)).  She also testified that the fact that a person can make a non-discriminatory decision

---

[3] On March 24, 2017, the Court ruled that Dr. Peery's expert testimony was admissible under Fed. R. Civ. P. 702.  *See* Dkt. No. 278.

in one instance does not preclude her from making a discriminatory decision in another instance. (Tr. 298:6-12 (Peery)).

### A. Stereotypes and Social Tuning

Dr. Peery testified that when considering the relationship between stereotypes and implicit bias, the focus is on the power of exposure. (Tr. 245:1-6 (Peery)). She explained that because implicit bias operates somewhat automatically in the brain, exposure to stereotypes can influence a person's behavior even if the person does not endorse the stereotype or believe it is true. (Tr. 245:6-15 (Peery)). She testified also that exposure to stereotypes need not be pervasive to have a discriminatory effect. (Tr. 296:5-11; 297:3-12 (Peery)).

Dr. Peery testified that "social tuning" can also result in discriminatory behavior. She explained that "social tuning" is the process whereby people as social creatures "tune" or conform to the behavior and viewpoints that they think will appeal to the people with whom they are trying to connect. (Tr. 242:1-10; 18-23 (Peery)). Dr. Peery testified that "social tuning" can occur subtly without any explicit exchange of information. (Tr. 304:5-17 (Peery)). She testified, for example, that employees will "tune" to managers, such that when an employee becomes aware of or suspects the attitudes or preferences of a manager, the employee will begin to espouse those same attitudes or behave in ways that they think will be viewed favorably by that manager. (Tr. 242:11-17 (Peery)).

Dr. Peery testified that she found evidence of stereotypes and the potential for social tuning in the FPN emails that she reviewed. (Tr. 259:18-24 (Peery)). Specifically, Dr. Peery found that the emails circulated among Metcalfe, Lightfine and Carlini not only contained racial stereotypes but also conveyed a protectionist attitude toward whiteness that could feed stereotyping and implicit bias. (Tr. 260:12-261:7, 268:19-270:16 (Peery); PX227; PX345). She

43

testified that the fact that Metcalfe repeatedly received—and did not express disapproval of—emails containing negative stereotypes about African Americans suggests that the senders at a minimum thought Metcalfe would tolerate the content of the e-mails. (Tr. 261:2-16, 261:22-262:4 (Peery)). Dr. Peery opined that the fact that Armon employees were on the emails spoke to a broader corporate culture that might include but go beyond FPN and raised the issue of social tuning, as the subsidiary FPN might "tune" to the parent company leading to discriminatory behavior consistent with the emails' content. (Tr. 259-260:4-11 (Peery)).

Dr. Peery also testified that the November 2009 email Acred forwarded to Waters and Barcik contained stereotypes about African Americans and demonstrated the concept of "othering"—*i.e.*, the creation of an us-versus-them mentality—which feeds into the use of stereotypes and implicit bias. (PX0230; Tr. 263:16-23 (Peery)). Dr. Peery testified that forwarding the email as Acred did suggests at minimum a tolerance, if not an outright endorsement of the email's contents. (Tr. 265:17-266:3, 301:8-11 (Peery); PX230). She testified with regard to Waters and Barcik that, given the power of exposure, merely receiving the email containing racial stereotypes could be sufficient to produce a discriminatory effect. (Tr. 265:6-16 (Peery); PX230).

Dr. Peery concluded that based on the evidence that emails containing stereotypes about African Americans were distributed at multiple levels and amongst multiple people at FPN, there is at the lowest level an exposure to and a tolerance of racial stereotypes at FPN and at the highest level an actual endorsement of such stereotypes. (Tr. 270:22-271:25 (Peery)). Dr. Peery testified further that there is a large body of research showing that the presence of racial bias and stereotyping affect all stages of the employment process including announcing that jobs are available, deciding whom to interview or hire, evaluating employees on the job, and making

44

decisions about promotions and terminations.  (Tr. 272:19-273:7 (Peery)).  Dr. Peery testified that research also shows that a climate of bias at an organization—like she found at FPN—leads to more discriminatory employment decisions in that organization.  (Tr. 273:17-22 (Peery)).

### B.    Aversive Racism and Anti-Affirmative Action Sentiment

Dr. Peery testified that "aversive racism"—as distinguished from "old-fashioned" racism associated, for example, with segregation and the pre-civil rights movement era—occurs when there is a divide between what a person will express publicly and what she feels or what influences her privately.  (Tr. 243:10-15 (Peery)).  Dr. Peery testified that opposition to affirmative action can be evidence of aversive racism.  (Tr. 275:11-24, 295:19-22 (Peery)).  She explained that the "classic" study on aversive racism looked at support for affirmative action and found that people who publicly espoused egalitarian values did not support affirmative action when it was seen to benefit African Americans rather than when it was seen to benefit other groups, thereby demonstrating a conflict between what they expressed explicitly and what actually drove their behavior.  (Tr. 243:16-24; 275:11-24 (Peery)).

 Dr. Peery testified that she found evidence of anti-affirmative action and anti-minority hiring requirement sentiments in the FPN emails she reviewed.  (Tr. 275:7-19 (Peery)).  She testified, for example, that emails like the November 2009 email Acred forwarded to Waters and Barcik and the Washington Post article Moran circulated in January 2012 and again in October 2012 contained discussion suggesting that affirmative action benefits people who do not deserve it and is the equivalent to discrimination against white people.  (Tr. 275:27-276:13, 278:14-279:11 (Peery); PX230; PX364).  Dr. Peery opined that the emails suggested a continuance of racial attitudes over the time period in which employment decisions related to Plaintiffs were made that is consistent with the research showing that racial attitudes are persistent and resistant

to change. (Tr. 280:22-281:7 (Peery)).  She did not opine as to whether there was actually aversive racism at FPN.  (Tr. 295:23-25 (Peery)).

### C.    Effect on FPN Decision-Making Process

Dr. Peery testified that social psychological, industrial and organizational literature shows that organizations with subjective, discretionary, non-accountable and non-transparent decision-making processes lack mechanisms to stop the automatic processes contributing to implicit bias and, therefore, are ripe for the influence of bias.  (Tr. 282:15-25, 283:15-21 (Peery)).  Dr. Peery testified that based on her review of deposition testimony describing the decision-making process at FPN she found that decision makers did not conduct systemic, quantitative evaluations of employees and made employment decisions based on subjective factors without any accountability.  (Tr. 284:6-21 (Peery)).  Dr. Peery testified that in her professional opinion because it lacked those features recognized in the research as helping to prevent the influence of stereotypes and bias, FPN's decision making process was ripe for the influence of implicit bias. (Tr. 285:7-12 (Peery)).

Ultimately, Dr. Peery opined that FPN had a corporate culture that fosters implicit bias at multiple levels and a decision-making process susceptible to the influence of implicit bias.  Dr. Peery did not offer any opinion as to whether FPN did, in fact, discriminate against the Plaintiffs, whether any bias held by the upper level management trickled down to other layers of the organization, or whether Acred or anyone else at FPN is racist.  (Tr. 239:11-13, 296:1-4, 303:6-304:4 (Peery)).

### IX.    Statistical Experts Dr. William Bridges and Dr. Jonathan Guryan

Plaintiffs presented expert Dr. William Bridges to testify as to discrepancies between white and black sprinkler fitters in FPN's employment practices. (Tr. 479:21-480:1 (Bridges)).

Dr. Bridges is a sociologist and specializes in the fields of social statistics, sociology of labor markets and social stratification and has extensive experience in quantitative and statistical analysis.[4]  (Tr. 478:8-12, 479: 9-20 (Bridges)).  Defendants presented rebuttal expert Dr. Jonathan Guryan to testify to deficiencies in Dr. Bridges' statistical analysis and offer alternative explanations for FPN's employment practices based on his own statistical analysis of FPN data. (Tr. 628:14-17, 629:1-10 (Guryan)).  Dr. Guryan is a social scientist and labor economist and conducts research focused on the causes and consequences of racial inequality in labor markets and education. (Tr. 624:6-25 (Guryan)).[5]

Dr. Bridges provided the following observations and opinions at trial: (1) FPN failed to hire any African Americans for supervisory positions above foreman; (2) hours and earnings of African American fitters declined from 2008 to 2011, whereas hours and earnings for white fitters declined only in 2009 and rebounded thereafter; (3) there was a statistically significant difference in African American fitters' hours and earnings compared to those of whites fitters before and after March 1, 2009 when Acred replaced Sullivan; (4) from 2008 to 2011, African American fitters were less likely than white fitters to be transferred and not laid off after a big job ended; and (5) work for African American fitters was concentrated in a small number of job sites and African Americans fitters worked on average fewer jobs than white fitters over time.

Dr. Guryan criticized Dr. Bridges' observations for two reasons: (1) Dr. Bridges failed to account for rival variables—for example, skill, performance, timing, or availability of African

---

[4] The Court held a *Daubert* hearing on February 6, 2017 and on March 24, 2017 ruled that Dr. Bridges' expert testimony was admissible under Fed. R. Civ. P. 702.  *See* Dkt. Nos. 254, 278.

[5] The Court held a *Daubert* hearing on February 9, 2017 and on March 24, 2017 ruled that Dr. Guryan's expert testimony was admissible under Fed. R. Civ. P. 702.  *See* Dkt. Nos. 255, 278.

American workers in the external labor market—as potential alternative explanations for any of his observations (Tr. 630:6-23, 636:24-637:1, 643:21-644:15 (Guryan); Tr. 602:12-20, 616:19-23 (Bridges)); and (2) Dr. Bridges failed to test for statistical significance and, therefore, rule out chance in any of his observations except for the before-and-after analysis. (Tr. 637:1-8, 642:3-643:13, 643:21-644:15 (Guryan); Tr. 566:4-569:10, 570:20-25, 597:13-20, 598:11-18 (Bridges)). Dr. Guryan testified that, in his professional opinion, Dr. Bridges' reports and conclusions "definitely" would not pass peer review standards. (Tr. 691:1-4 (Guryan)).

### A.      Lack of African American Fitters in Supervisory Positions

Dr. Bridges analyzed FPN payroll data for 2008 through 2011 and concluded that FPN failed to hire an African American or person of any other minority for supervisory positions above foreman during that period. (Tr. 482:4-15, 482:24-484:18, 486:17-487:2 (Bridges); PX0389).

### B.      Declining Hours and Earnings for African American Fitters

Dr. Bridges summarized FPN payroll data from 2008 to 2011 in order to analyze the number of employees, job classification, aggregate hours worked and aggregate earnings by race and ethnic group. (Tr. 483:1-484:2 (Bridges); PX389). He concluded based on his analysis of this data that the hours and earnings of African American journeyman and foreman fitters at FPN declined over time, in both aggregate terms and as a percentage of total hours and earnings by all FPN fitters. (Tr. 487:3-20, 488:14-491:21 (Bridges); PX0389, PX0390, PX0391.) Dr. Bridges expanded his analysis using Local 281 data from 2008 through 2014 and concluded that the trend of declining African American employment at FPN continued beyond 2011 and through January 2015. (Tr. 491:22-492:1, 492:22-494:10 (Bridges); PX0396.)

48

Dr. Bridges also found that while both African American and white fitters experienced a decline in hours in 2009, the decline was greater for African-American fitters. (PX389). Specifically, the total number of hours worked by white journeyman and foreman fitters in 2008, 42,967 hours, declined by approximately 18% in 2009 to 35,323 hours, while the total number of hours worked by African American journeyman and foreman fitters in 2008, 5,496 hours, declined by approximately 42% in 2009 to 3,176 hours. (PX0389). Furthermore, the white fitters as a group experienced declining hours only in 2009; thereafter, total hours worked by white fitters increased and exceeded 2008 levels in both 2010 (up 29% to 45,271 hours) and 2011 (up 11% to 50,553 hours). (*Id.*; Tr. 487:14-20 (Bridges)). African American fitters as a group experienced declining hours every year from 2008 through 2011: down 27% to 2,338 hours in 2010 and down 95% to 114 hours in 2011. (PX389; Tr. 487:14-20 (Bridges)).

Dr. Bridges did not conduct a statistical test to rule out chance or conduct rival variable testing to rule out alternative explanations. (Tr. 560:6-562:15, 566:4-569:25, 594:11-15 (Bridges)). Dr. Guryan testified that several rival variables could potentially explain the patterns Dr. Bridges observed, for example, skill level, fitter performance, willingness to accept work offered, job site location relative to fitters' homes or availability of African American workers in the external labor market. (Tr. 639:8-19 (Guryan)). Dr. Guryan explained that while Dr. Bridges need not control for every possible rival variable, the analysis becomes more informative as more rival explanations are controlled for and ruled out. (Tr. 645:6-8, 641:21-22 (Guryan)).

Dr. Guryan conducted a test controlling for the availability of African American workers in the Local 281 labor pool to determine if availability was one possible non-discriminatory explanation of the decline in hours and earnings among African American fitters at FPN. (Tr. 648:12-19 (Guryan)). Based on what he deemed the most conservative view of the data

available, Dr. Guryan observed that from 2008 to 2011 African American fitters were over-represented at FPN when compared with the number of African American fitters in the Local 281: the percentage of fitters who were African American at FPN was greater than the percentage of fitters who were African American in the Local 281 labor pool. (Tr. 649:23-650:6, 653:16-22 (Guryan); DX176). Additionally, on average from 2008 through 2011, FPN's employment of African Americans was statistically significantly higher than the labor-pool benchmark for those four years. (Tr. 655:8-13, 658:16-23 (Guryan)). Broken down by individual years, however, FPN's employment of African Americans was only statistically significantly higher than the labor-pool benchmark in 2008; Dr. Guryan could not rule out chance for the observations in 2009 and 2010. (Tr. 654:24-4, 658:16-23 (Guryan)). FPN's employment of African Americans was actually lower than the percentage of African Americans in Local 281 in 2011, though not to a statistically significant degree. (Tr. 655:5-7, 658:16-23 (Guryan); DX176).

### C. Disparity in African American Fitters' Hours and Earnings Before and After March 1, 2009

Dr. Bridges conducted a before-and-after test analyzing the change in hours and earnings of the average African American fitter before and after March 1, 2009, when Sullivan was transferred to a different role and Acred became the primary decision-maker with regard to fitter employment at FPN. (Tr. 506:7-21 (Bridges)). 70 white fitters and four African American fitters worked as journeymen or foremen for FPN both before and after March 1, 2009. (Tr. 507:9-508:10 (Bridges)). Dr. Bridges found that the average white fitter worked 350 more hours after March 1, 2009 whereas the average African American worked 538 fewer hours after that date. (Tr. 509:23-510:3 (Bridges)). Dr. Bridges conducted a t-test for statistical significance and

found that the difference was statistically significant with less than 1% probability the result occurred by chance. (Tr. 508:11-509:14 (Bridges)). Dr. Bridges conducted the same analysis with regard to earnings and observed the same pattern: earnings by white fitters increased while earnings by African American fitters decreased after March 1, 2009 with a 1% probability the result occurred by chance. (Tr. 510:4-13 (Bridges)). Dr. Bridges did not offer any opinion as to whether the difference between African American and white fitters before and after March 1, 2009 could be attributed to discrimination or to the Great Recession. (Tr. 510:18-21, 525:9-21 (Bridges)).

Dr. Bridges did not conduct rival variable testing to rule out alternative explanations for his observations. (Tr. 570:1-3, 20-25, 575:12-577:1, 594:11-15 (Bridges)). Dr. Bridges testified, however, that in his opinion the availability of workers in the external labor pool was not relevant to the before-and-after analysis because it compared only fitters employed by FPN and, therefore, changes in the external labor pool would not affect the analysis. (Tr.511:22-512:10 (Bridges)). Dr. Guryan noted that the before-and-after analysis did not consider whether individuals considered in the data ever turned down work or were not available to work during any period of time or other variables that could explain the pattern, for example, the types of jobs being done at FPN and the skill requirements for those jobs. (Tr. 679:5-680:23 (Guryan)). This lack of incorporating these variables significantly undermined the validity of Bridges' conclusions. After weeks of testimony, it was clear to the Court that a pipefitter would not necessarily be available for every job, especially if he was already working on another project. The named plaintiffs each described scenarios where they did not notify the employer about their desire to be placed on a particular job at a particular time because they were already working, working for a different company, or doing something entirely different. Bridges' statistical

51

analysis failed to take into account these numerous and inherent variables thereby significantly diminishing their value. In fact, his analysis suggested that every AfricanAmerican pipefitter was always available for every job even if that particular person was already working in a position and even in a position as a superintendent.

### D. Disparity in Likelihood of Reassignment of White and African American Fitters after a Large Job

Dr. Bridges compared how FPN treated African American and white fitters after a large job ended. (Tr. 514:8-515:3 (Bridges)). "Large" jobs were jobs that required at least 1,000 hours of fitter labor. (Tr. 514:14-18 (Bridges)). Dr. Bridges found that in 2009 through 2011, white fitters working on a large job at any point during that job were more likely than African American fitters to be reassigned within two weeks of the job ending versus laid off. (Tr. 514:8-515:3, 516:12-21 (Bridges)). Specifically, of all fitters who had worked on a large job, African Americans continued working for FPN after that job ended only 20% of the time in 2009 and 0% of the time in 2010 and 2011. (Tr. 518:25-519:6 (Bridges); PX402). White fitters, on the other hand, continued working for FPN 48.6% of the time in 2009, 75% of the time in 2010 and 76.4% of the time in 2011. (PX402). Dr. Bridges conducted a similar test for fitters who had worked on a large job within the last 30 days of the job and found a similar trend. (Tr. 517:22-23 (Bridges)). As Dr. Guryan opined, however, these analyses are misleading because as many people who worked on a job at one point are not still working on the job as it ramps down within the last 30 days or when it eventually ends. (Tr. 684:23-686:5 (Guryan)). More importantly, it assumes that African American fitters are available for the position.

Dr. Bridges did not conduct a statistical test to rule out chance or conduct rival variable testing to rule out alternative explanations. (Tr. 570:1-3, 575:12-577:1, 594:11-15, 598:11-18

(Bridges)). Dr. Bridges testified again that in his opinion the availability of workers in the external labor pool was not relevant to this analysis because it only pertained to fitters employed by FPN. (Tr. 519:10-22 (Bridges)).

###### E. Segregation of African Americans to a Subset of Jobs

Dr. Bridges testified that that, based on his analysis of the FPN payroll data, hours worked by African American employees were concentrated in a small number of job sites. (Tr. 494:22-495:23 (Bridges)). For example, Dr. Bridges found that in 2010, five jobs accounted for more than 90% of African American hours: Boone Clinton, Walmart, Powell School, Lee Pasture School, and Matteson Community. (Tr. 497:18-498:7 (Bridges); PX0395). For each of these jobs, FPN's contract included a minority hiring requirement (Matteson) or, if it did not, FPN represented to the general contractor that it would provide minority labor (Boone County, Lee Pasture, Walmart, Powell). (Tr. 1289:11-21, 1329:19-21, 1373:14-1375:13 (Hebert); Tr. 1816:16-1817:1 (Waters); 11/11/15 Hebert 30(b)(6) Dep. Des. 120:16-2015; Hebert (individual) Dep. Des. 135:22-136:19; JX24; PX162; PX163; PX215; PX293; FPTO, Ex. 1 SOUF ¶ 46). Additionally, all five jobs were located in a majority-minority neighborhood—although only the Matteson, Walmart and Powell jobs were in predominantly African American neighborhoods. (PX162; PX163; PX215; PX288; PX293; PX296; PX300; PX315; PX507; PX509; PX510; FPTO, Ex. 1 SOUF ¶ 46). FPN also assigned white fitters to each of these five jobs. (JX34.)

Dr. Bridges summarized the job distribution patterns by using an index of dissimilarity statistic: an index of zero indicates that the distribution of hours amongst white and African American fitters at these job sites was exactly equal and an index of 100 indicates there is no overlap at all. (Tr. 498:19-500:4 (Bridges)). Dr. Bridges found with respect to the FPN data that the index of dissimilarity was 90%, meaning 90% of labor hours must be redistributed to achieve

a proportional distribution. (Tr. 500:5-8 (Bridges)). Dr. Bridges conducted a computer simulation to determine what the index would have been if individuals were randomly assigned to job sites and found that of 10,000 simulations of random assignment, the index of dissimilarity was 90% or higher only 3% of the time. (Tr. 503:8-506:5 (Bridges)).

Dr. Bridges also testified that from 2008 to 2011, on average, African American fitters worked on fewer jobs than white fitters over time. (Tr. 520:6-523:2; PX0403). FPN employed four African Americans in 2010: Martin, Truesdell, Tejada and James Pikes. (JX0034). 100% of Martin's hours, 100% of Tejada's hours, 89% of Truesdell's hours and 81% of Pikes' hours worked for FPN in 2010 were recorded at one these five locations. (JX34; PX478A; PX483A).

Except for the dissimilarity index, Dr. Bridges did not conduct a statistical test to rule out chance or conduct rival variable testing to rule out alternative explanations as to why on average African Americans fitter worked at a smaller number of jobs. (Tr. 597:13-20, 602:12-20, 616:19-23 (Bridges)). Dr. Guryan testified that Dr. Bridges should have done so, particularly given the small number of African American employees at FPN. (Tr. 674: 1-10 (Guryan)).

Neither Dr. Bridges nor Dr. Guryan provided an opinion as to whether African American fitters were treated unfairly or differently or suffered any other disadvantage by being segregated to certain jobs. (Tr. 570:15-21, 571:17-20, 595:19-25, 600:15-24 (Bridges) Tr. 676:23-677:5 (Guryan)).

## CONCLUSIONS OF LAW

### I. Timeliness Arguments

As an initial matter, FPN uses its Proposed Conclusions of Law to relitigate certain issues already decided on summary judgment—namely, that FPN waived its Section 1981 time bar affirmative defense (*see* Dkt. No. 280 at 14-16); that Plaintiffs did not fail to exhaust all

administrative remedies with regard to failure to transfer or rehire claims (*see id.* at 16-19); and that Martin's and Truesdell's second right-to-sue letters from the EEOC are effective. (*See id.* at 16, n.9.) The Court will not reconsider its prior rulings. Additionally, Plaintiffs timeliness and administrative exhaustion arguments with regard to Martin's and Truesdell's claims based on their 2009 layoffs are moot; Martin and Truesdell waived such claims. (Dkt. No. 307; *see also* Dkt. No. 220 at 7, n.8-9; Dkt. No. 221 at 7, n.6-7.)

## II.    Evidentiary Issues

At trial, Defendants objected to the admissibility of various documents presented by Plaintiffs during trial. The court either ruled on the objection when raised or took it under advisement, allowing the evidence to be presented because, unlike a jury, the court can separate what is and is not admissible when conducting its ultimate review of Plaintiffs' case. To the extent a document taken under advisement is considered within this opinion, it was deemed admissible.

## III.    Plaintiffs' Discrimination Claims

Martin and Truesdell allege disparate treatment claims under Title VII and Section 1981; Tejada brings his remaining claim under Section 1981. "[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *McGowan v. Deere & Co*., 581 F.3d 575, 579 (7th Cir. 2009) (quoting *Johnson v. City of Fort Wayne, Ind*., 91 F.3d 922, 940 (7th Cir.1996)); *see also Sublett v. John Wiley & Sons, Inc*., 463 F.3d 731, 736 (7th Cir. 2006). Therefore, the discussion that follows applies with equal force to the remaining claims under both Title VII and Section 1981.

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit eliminated the distinction between "direct" and "indirect" evidence in employment discrimination claims. 834 F.3d 760,

764 (7th Cir. 2016). Instead, "evidence must be considered as a whole." *Id.* While *Ortiz* did not disturb the burden-shifting framework under *McDonnel Douglas*, that framework does not apply to the fact-finder's analysis at trial. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (at a bench trial, the burden-shifting framework "drops from the case," "the factual inquiry proceeds to a new level of specificity," and the question is whether "the employer . . . treat[ed] some people less favorably than others because of their race") (internal citations and quotation marks omitted)); *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("[T]he original purpose of *McDonnell Douglas* . . . was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach a trier of fact"); *Mattenson* v. *Baxter Healthcare Corp*., 438 F.3d 763, 767 (7th Cir. 2006) (reversing district court that gave a *McDonnell Douglas* instruction at trial "despite tireless repetition by appellate courts that the burden-shifting formula of that case is not intended for the guidance of jurors; it is intended for the guidance of the judge when asked to resolve a case on summary judgment"); *Hennessy v. Penril Datacomm Networks, Inc*., 69 F.3d 1344, 1350 (7th Cir. 1995) ("It is well-established in this circuit that the burden-shifting methodology should not be used during the jury's evaluation of evidence at the end of a trial on the merits . . ."); *Gehring v. Case Corp*., 43 F.3d 340, 343 (7th Cir. 1994) ("[T]he Supreme Court has held that this burden-shifting model applies to pretrial proceedings, not to the jury's evaluation of evidence at trial."). Therefore, the Court need only focus on "the sole question that matters: Whether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different [race], and everything else had remained the same." *Ortiz*. 834 F.3d at 764; *see also* Seventh Circuit Pattern Jury Instructions, 3.01 ("Plaintiff must prove by a preponderance of the evidence that he was laid off, not transferred, and not rehired by Defendant because of his race. To determine that Plaintiff was laid off, not transferred, and not rehired

because of his race, you must decide that Defendant would not have laid off and failed to transfer or rehire Plaintiff had he been white but everything else had been the same.").

At trial, Plaintiffs offered the following evidence to show FPN laid off or failed to transfer or hire them because of their race: evidence of a racially biased corporate culture and a decision-making process ripe for influence by such bias at FPN; evidence regarding each plaintiff's individual career at FPN; statistical evidence of alleged systemic discrimination against African Americans by FPN; and evidence of alleged segregation or "pigeonholing" of African American fitters into a subset of jobs by FPN.

Plaintiff's evidence certainly raises concerns about the culture at FPN. There is no question that certain high-level executives at FPN and its parent company held disturbingly racist views and were comfortable expressing these views amongst each other in a work environment. It is less clear, however, what effect if any that bias at the executive level had on any employment decisions made with regard to Plaintiffs. Ultimately Plaintiffs failed to establish that necessary link and, thus, failed to show by a preponderance of the evidence that FPN failed to transfer or rehire them at any time because of their race.

## A. A Susceptibility to Influence of Implicit Bias Does Not Prove Actionable Discrimination

Evidence of a racially-biased corporate culture can be circumstantial evidence of discrimination against a particular plaintiff. *See Mattenson*, 438 F.3d at 770 (observing that "[p]roof of a *pervasive* firm or divisional culture of prejudice against . . . minority workers" "implies some likelihood that the plaintiff lost his job because of discrimination, though not a certainty, because even in a discriminatory workplace some employees are fired for reasons unrelated to their membership in a group that the employer discriminates against") (emphasis in

original); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff.") (internal quotation marks omitted). Evidence that a workplace had an atmosphere of racial bias or that corporate executives held racial attitudes goes to motive and whether such atmosphere or attitudes may have tainted the adverse employment decision. *See, e.g., Margolis v. Tektronix, Inc.*, 44 Fed. Appx. 138, 141 (9th Cir. 2002) (observing that a jury may use "evidence which tends to show an atmosphere of gender discrimination" to find that discriminatory bias "tainted the layoff decision" in reduction in force); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597-98 (1st Cir. 1987) (observing that "circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim"). It is also useful in assessing whether the proffered reasons for the adverse employment decision are merely pretext. *See, e.g., Ryder v. Westinghouse Electric Corp.*, 128 F.3d 128, 132 (3d Cir. 1997) ("[A] plaintiff may offer circumstantial proof of intentional discrimination . . . in the form of . . . formal or informal managerial attitudes held by corporate executives. We have noted that it is often crucial to the [factfinder's] assessment of whether the employer's reasons were pretextual and the ultimate question whether the employer intentionally discriminated against an employee." (internal citations omitted)); *Antol v. Perry*, 82 F. 3d 1291, 1302 (3d Cir. 1996) ("The atmosphere is relevant to whether defendant's asserted legitimate non-discriminatory reasons were pretextual and relevant to the ultimate issue of whether defendant intentionally discriminated against plaintiff.")

While evidence of a discriminatory culture is not in and of itself proof of individualized discrimination, it "tend[s] to add color to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff," *Cummings*, 265 F.3d at 56, 63 (1st Cir. 2001) (internal quotations omitted), and is therefore useful to the trier of fact when considering the evidence as a whole under *Ortiz*. *See Mattenson*, 438 F.3d at 770 (citing *Cummings* with approval); *see also Conway*, 825 F.2d at 597-98 (While "'proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual,' it may be one indication that the reasons given for the employment action at issue were 'implicitly influenced' by the fact that the plaintiff was of a given race, age, sex or religion") (quoting *Sweeney v. Bd. of Trustees of Keene State Coll.*, 604 F.2d 106, 113 (1st Cir. 1979)). Dr. Peery's testimony provided just that—circumstantial evidence that helped contextualize other evidence presented at trial, in particular the emails and testimony regarding racists comments and attitudes. Specifically, Dr. Peery's testimony showed how stereotypes and aversive racism *could have* influenced decision-makers at FPN.

The emails containing racist remarks that were circulated among Metcalfe, Moran, Lightfine and Carlini are indicative of a broad corporate culture of bias within Armon, FPN and possibly other subsidiaries. Remarks by corporate executives are particularly probative of a discriminatory environment. *See, e.g., Ercegovich*, 154 F.3d. at 356 (remarks that are "'not an off-hand comment by a low-level supervisor but a remark by a senior official" are probative of "corporate state-of-mind or a discriminatory atmosphere"); *Ryder*, 128 F. 3d at 133 (remark was "particularly" probative of "informal managerial attitudes" because it was by the CEO rather than "an off-hand comment made by a low-level supervisor"). Remarks evidencing corporate bias, even if isolated or non-contemporaneous with employment decisions, are more than mere

"stray remarks" and may be probative of discrimination. *See Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 632 (7th Cir. 1996) ("statements by top officers at Coca-Cola indicating a corporate bias against women holding upper-management positions" were "more than just stray comments").

Moreover, FPN's decision-making process was "ripe" for influence by this corporate culture of bias. Employment decisions were highly subjective and made by one individual with input from only a handful of others. And FPN did not employ any meaningful internal mechanisms to prevent racial bias at the executive level from shaping employment decisions made below. FPN's practices were imperfect and certainly created a *potential* for racial discrimination. *See, e.g., Kimble v. Wis. Dep't of Workforce Dev.*, 690 F.Supp.2d 765, 775-76 (E.D. Wis. 2010) ("[W]hen the evaluation of employees is highly subjective, there is a risk that supervisors will make judgments based on stereotypes of which they may or may not be entirely aware."). Yet, they do not by themselves show that FPN decision-makers actually decided not to transfer or rehire Plaintiffs based on their race.

Plaintiffs must show the bias affected the actual decision-makers such that the company engaged in unlawful discrimination. The emails circulated amongst Metcalfe, Lightfine, Carlini and Moran are not enough as none of these individuals made any decisions about fitter employment at FPN. *C.f. Emmel*, 95 F.3d at 632 (executives that made remarks indicating corporate bias against women were actually involved in the promotions at issue). Additionally, a corporate bias or the bias of non-decision-makers cannot merely be imputed to actual decision-makers to find discriminatory action. *See, e.g., Jackson v. City of Chi.*, No. 13 C 8304, 2016 WL 1056656, *11-12 (N.D. Ill. Mar. 17, 2016) (intentional discrimination cannot be inferred where there is a lack of connection between the alleged bias and the adverse decision). Acred

made all fitter employment decisions for FPN in 2009 and 2010 when Plaintiffs were laid off. Thus, Plaintiffs had to show that Acred's decisions were in fact improperly influenced by an implicit bias. *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (to impute discriminatory motive under "cat's paw" theory plaintiffs must show decision-maker was in fact manipulated by non-decision-maker); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (in retaliation claim, plaintiffs must establish that a "retaliatory motive *actually* influenced the decision-maker, not merely that it *could have*" or, under the "cat's paw" theory of liability, that someone "improperly influenced the decision-makers") (emphasis in original); *Jackson*, 2016 WL 1056656 at *11 ("Speculation that improper influence may have existed is insufficient" to succeed on claim under cat's paw theory.).

Plaintiffs failed to establish by a preponderance of the evidence that Acred made decisions influenced by an implicit bias. *C.f. Kimble*, 690 F.Supp.2d at 778 ("[I]n addition to failing to provide a credible explanation of the conduct complained of, [the decision maker] behaved in a manner suggesting the presence of implicit bias."). Plaintiffs identified a handful of emails that Acred received between 2009 and 2012 that exposed him to racial stereotypes about African Americans that *could have* created implicit bias. *See, e.g., Margolis*, 44 F. App'x at 141 (observing that "stereotyping, as possibly indicated by [supervisor's] remarks, can serve as evidence that gender played a role in the employer's decision") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)); *Kimble*, 690 F.Supp.2d at 776 (recognizing that stereotypes "can bias how [individuals] process and interpret information and how they judge other people.") (citing several law review articles on the subject of implicit bias). But none of the emails raises an issue of "social tuning" as Acred received each from either a peer or subordinate and not from a supervisor whose views Acred might subconsciously adopt as his own. Acred forwarded two

of the emails to Waters and Barcik indicating a possible tolerance or endorsement of their contents. Notably, the emails he forwarded contained, among other statements, complaints about affirmative action—an issue FPN managers faced daily due to minority hiring requirements. The emails could reflect an implicit racial bias against African Americans; they could also reflect a more benign frustration with affirmative action initiatives that sometime reduced FPN project margins on jobs.

Other evidence negates any notion Acred's employment decisions were influenced by an implicit bias. Acred never displayed racist attitudes at work. The fact that Acred used a racial slur fifteen years ago, before ever becoming superintendent, in his own home and not directed at any particular person is hardly evidence he held and acted on racist views in 2009 and 2010 when deciding whether to transfer or rehire Plaintiffs. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[I]solated comments are not probative of discrimination unless they are contemporaneous with the discharge or causally related to the discharge decision-making process." (internal quotation omitted)); *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) ("stray remarks are . . . insufficient to establish discriminatory motivation" unless "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action."). Rather, ample evidence presented at trial suggests Acred based these decisions on legitimate reasons, such as lack of work or poor performance on a job.

Acred took his responsibility as superintendent seriously. Plaintiffs denied ever being treated unfairly by Acred and FPN witnesses vouched for his capabilities as a supervisor. Even Sullivan, who Plaintiffs contend was the fairer of the two superintendents, testified that Acred was a good evaluator of personnel and job situations and that he always valued and agreed with

Acred's opinions.  Acred even laid off his own brother over better performing fitters when there was a lack of work, despite then having to provide for his brother for three years as a result.

Ultimately, Plaintiffs failed to tie Dr. Peery's opinions regarding implicit bias to the individual circumstances surrounding their employment with FPN as required to prove intentional discrimination actually occurred at FPN.  *See, e.g.*, *Abdel-Ghaffar v. Illinois Tool Works, Inc*., No. 12 C 5812, 2015 WL 5025461, at *8 (N.D. Ill. Aug. 24, 2015), *as amended* (Sept. 30, 2015), *aff'd*, 706 F. App'x 871 (7th Cir. 2017) (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("Bigotry. . . is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action); *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1004 (7th Cir. 1994) ("Liability under Title VII does not turn on the bigotry of company managers unless that bigotry resulted in injury to the plaintiff. . . . There needs to be a link between a[] [company's] manager's alleged prejudice, and the decisions that [plaintiff] is challenging.") (internal citation omitted)).

**B. Plaintiffs Failed to Prove Actionable Discrimination in FPN Decisions to Not Transfer or Rehire**

**i.  Plaintiff Kenneth Martin**

Martin claims FPN failed to transfer him in 2009 and failed to transfer or rehire him in 2010 because of his race.  FPN laid off Martin in September 2009 after the DePaul O'Malley Lewis job ended.   By 2009 Martin had been in the industry for more than a decade and had a reputation as a good worker.  Before being laid off, he worked steadily without interruption under Sullivan and then Acred for four years.  He received consistent B and B- ratings from FPN throughout the previous year including as recently as September 3, 2009.  The O'Malley Lewis

job was successful and, by all indications, Martin was meeting performance expectations in September 2009.

Martin claims he should have been transferred to another job after the O'Malley Lewis job ended. Martin identified a handful of white fitters he claims were assigned to ongoing jobs at the time he was laid off including Erik Massey to the Kellogg Cancer Center, Dan Hughes to Lee Pasture, William Sulich to DePaul, Randy Iverson to Bestway and Gordon Ritter to Bestway and others. While these men were foreman for FPN, they were not necessarily similarly situated as Martin. *See Bio v. Fed. Express Corp*., 424 F.3d 593, 597 (7th Cir. 2005) ("A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'") (citation omitted); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 619 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d 760 (7th Cir. 2016) ("[A] showing of discrimination requires more – much more than simply identifying employees who obtained jobs around the same time that the plaintiff was looking for a position."). None of these men worked with Martin on the O'Malley Lewis job. Also, except for Iverson, each of these individuals was assigned to the jobs listed at least one week before Martin was even laid off. Martin was not transferred to the Bestway job; instead, he was laid off for "lack of work" which he claims is pretext.

Unfortunately for Martin, the Great Recession hit the fitter industry and halted all work at FPN in 2009. Sullivan credibly confirmed that when he transferred roles in February 2009 there were no new, upcoming jobs at FPN. *See Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) ("An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness."). Dr. Bridges' observation that hours and earnings declined for both African Americans and whites in 2009 is consistent with Sullivan's testimony. *See Adams v. Ameritech Services, Inc.,* 231 F.3d 414, 423 (7th Cir. 2000) (recognizing that

"statistical evidence can be very useful to prove discrimination in [disparate treatment] cases," although "it will likely not be sufficient in itself"). Dr. Bridges also found that the decrease was greater for African Americans than whites, however, he failed to rule out chance or other alternative explanations for that trend.

Martin attributes the failure to transfer to the change in leadership from Sullivan to Acred. But there is little support for this claim. Acred had historically transferred Martin when work was available. Martin worked steadily for Acred for nearly six months and, when work on the O'Malley Lewis job was slow, Acred would transfer Martin to other jobs to keep him busy. Martin never filed any complaint against Acred in 2009 or after. Dr. Bridges' before-and-after analysis shows a statistically significant difference in hours worked by African Americans and white fitters before and after March 1, 2009 but fails to account for any alternative explanations, for example, that African American fitters declined FPN's offers to work as Truesdell did in December 2009 or were unavailable because they began working for a competitor as Martin in January 2010. Finally, and most notably, Acred was the person to rehire Martin in June 2010.

Martin worked on the Boone County job from June 2010 until August 2010 when the job ended and he was laid off. Martin had performance issues on the Boone County job. Acred hired him to continue as foreman when FPN took over the job from Martin's previous employer, UFP. Martin assisted in creating the schedule and estimated labor cost for completing the job that FPN submitted to the general contractor but then exceeded that budget by nearly double. Labor-hour budgets are key components of any bid submitted for a job and exceeding budgeted hours directly affects the job's profitability.

Following Boone County, FPN's opinion of Martin's capabilities changed. When FPN took over the job, Hebert believed Martin was the best man for the job. Hebert testified that after

Boone County he would not have rehired Martin if it had been his decision.  Indeed, Acred laid off and did not transfer Martin when the job ended.  Acred believed he had a legitimate basis for his decision. *See Gates v. Caterpillar, Inc.,* 513 F.3d 680, 689 (7th Cir. 2008) ("The proper inquiry mandates looking at Gates' job performance through the eyes of her supervisors at the time of her suspension and termination.); *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 901 (7th Cir. 2005) ("Certainly earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken.") (citation omitted).

Martin called FPN to inquire about work a few times after being laid off.  Martin identified several jobs ongoing jobs to which white fitters including Massey, Sulich, Hughes, Iverson and Gordon Ritter were assigned around the time he was laid off and calling to inquire about work.  Only Hughes worked on the Boone County job with Martin.  However, unlike Martin, Hughes never had a performance issue similar to Martin's.  *See, e.g., Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (finding poor performance as non-discriminatory reason for termination and that performance histories are relevant to the similarly situated analysis).  A flood occurred on one of his jobs in 2009 but Hughes was not responsible.

Regardless, shortly after being laid off, Martin enrolled in school and never called FPN again about work. As was standard in the fitter industry, if Martin was interested in rehire, he should have contacted FPN.  But even if FPN tried to contact him, he would have been in school and unavailable for rehire.

Martin failed to show by the preponderance of the evidence that he would have continued working for FPN through 2009 and 2010 had he been white and everything else remained the same.

### ii.    Plaintiff Aaron Truesdell

Truesdell claims FPN failed to transfer him in 2009 and failed to transfer or rehire him in 2010 because of his race.  Truesdell worked steadily for FPN under Sullivan and then Acred from 2006 to 2009.  Sullivan hired Truesdell based on his reputation as a good worker and foreman.  Truesdell performed well from 2006 to 2009 and received a B+ on every rating FPN conducted.  Truesdell worked as a night foreman with Martin on the O'Malley Lewis project and as head foreman on the CME Project.  Both projects were profitable for FPN.  Chase Bank was the last job he worked on before being laid off in July 2009 at which time Truesdell appeared to be meeting performance expectations.

Truesdell identified only one white fitter who was assigned to work on an ongoing job within a few weeks of Truesdell's layoff when he claims he should have been transferred: William Sulich who was transferred to DePaul Media Center.  Truesdell's other alleged comparators were not assigned to a new job until more than one month after his layoff.  It is worth nothing that Iverson is one of Truesdell's claimed comparators, however, Truesdell testified that he was hired to replace Iverson, a white fitter, on the Chase Bank job.  The fact that Truesdell replaced a white fitter on a job is not consistent with his claim that FPN treated white fitters more favorably than African American fitters.

FPN laid off Truesdell for "lack of work" which he claims is pretext.  Truesdell was laid off within two weeks of Martin.  As already discussed, FPN presented credible evidence that the Great Recession in fact affected its job activity and that Sullivan and Acred had lay off more workers as a result.  Similarly, Truesdell cannot credibly attribute the lack of transfer to the change in leadership from Sullivan to Acred.  Like Sullivan, up until Truesdell's layoff, Acred would transfer Truesdell from job to job to avoid laying him off and allowed him to collect

wages at the foreman rate even when he worked journeyman because no foreman work was available

Significantly, FPN reached out to Truesdell about coming back to work twice, in December 2009 and February 2010, but he declined. Truesdell told FPN he preferred to work for minority-owned competitor UFP. During that time, Truesdell has an "open invitation" to return to FPN. This, too, is inconsistent with any claim he was treated unfavorably. Eventually, Truesdell accepted the invitation and returned to FPN.

Truesdell returned to work on the Lee Pasture job again replacing a white fitter as foreman—yet another fact inconsistent with the belief he was being treated less favorably than whites. FPN laid off Truesdell in September 2010 after the Walmart job. FPN considered the Walmart job a "failure" and blamed the salesperson for submitting an unrealistic bid but, as Acred testified and the After Action Report confirms, also blamed Truesdell as foreman for poor communication and not staying within the budgeted hours. Truesdell may not have been entirely at fault but in FPN's view he was at least partly so. *See Abdel-Ghaffar v. Illinois Tool Works Inc.*, 706 F. App'x 871, 875 (7th Cir. 2017) ("Courts are not concerned with whether an employer's reason for discharge was inaccurate or unfair, but whether the employer honestly believed the reason it has offered.") (internal quotations omitted). FPN did not transfer Truesdell after the Walmart job; he was again laid off for "lack of work." Truesdell identified white fitters who were assigned to ongoing jobs at that time including Massey, Sulich, Hughes and Ritter. None of these individuals worked on the Walmart job with Truesdell or otherwise oversaw a "failure" of a job that required an After-Action meeting and Report. Regardless of whether other jobs were available, Acred believed he had a legitimate reason for not transferring Truesdell. *See, e.g., Cruz v. John-Jay Corp.,* No. 3:05CV508 CAN, 2006 WL 3136725, at *7 (N.D. Ind.

Oct. 30, 2006) (although plaintiff can point to similarly situated worker treated more favorably, claim still fails because he cannot show he was legitimately meeting performance expectations at the time of termination); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("The fact that [plaintiff] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination.").

Truesdell testified that he did not feel he was being treated unfairly by Acred or anyone else when laid off in 2010. Following his September 2010 layoff, Truesdell never called FPN to inquire about work. Pursuant to industry standard, Truesdell should have called FPN if he were truly interested in rehire. He admits that he never asked for his job back.

Truesdell failed to show by the preponderance of the evidence that he would have continued working for FPN through 2009 and 2010 had he been white and everything else remained the same.

### iii. Plaintiff Johnny Tejada

Truesdell claims FPN laid him off and failed to transfer or rehire him in 2010 because of his race. Tejada worked for UFP steadily for two years before being hired by FPN. Tejada worked on the Powell School job, which FPN took over in June 2010. Acred hired Tejada at the general contractor's recommendation and assigned Tejada as a journeyman fitter and white fitter Eric Woolwine as foreman on the Powell School project. When the job ended two to three months later in September 2010, Tejada was not transferred and was laid off for "lack of work." Woolwine was not laid off or transferred at that time because he was foreman and was required to stay on the job longer.

Tejada identified Woolwine as being similarly situated but he was not. FPN hired and employed Woolwine as a foreman fitter; Tejada never worked for FPN as a foreman. *See, e.g.,*

69

*Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc*., No. 05 C 1137, 2006 WL 2699416, at *7 (N.D. Ill. Sept. 19, 2006) ("Plaintiff and [her alleged comparator] were not similarly situated since they held different job positions with different responsibilities."); *Eles v. Barber-Coleman Co*., No. 93 C 7580, 1996 WL 5316, at *3 (N.D. Ill. Jan. 4, 1996) (finding that employee holding management or supervisory responsibilities not comparable to an employee who does not). Also, Woolwine's skill level exceeds Tejada's. Woolwine was more productive than Tejada and had a reputation for great job performance and was even nicknamed "Eric Awesome."

Tejada claimed he should have been transferred to a Walmart job stating at the time but in fact no such job existed. Tejada also claims he should have been transferred to the Ogden Elementary job starting in the fall of 2010. This job did exist. However, FPN ultimately subcontracted the labor to another company.

Tejada was not available or eligible for rehire following his layoff. Tejada changed his number without notifying FPN so if FPN had wanted to reach out about a possible job opportunity it would not have been able to make contact with him. Tejada contacted FPN only once and when he did not was not to inquire about work but to leave a paper trail in anticipation of this case. Tejada was not eligible for hire as a union member not in good standing as of January 2011. Finally, in 2011, Tejada moved three hours away to Battle Creek, Michigan with no intention of working in Chicago.

Tejada failed to show by the preponderance of the evidence that he would have continued working for FPN in 2010 had he been white and everything else remained the same.

## C. Segregation Theory of Liability

Plaintiffs' "pigeonholing" theory—that beginning in 2010 FPN segregated African American fitters by employing them only on jobs for which there was a minority hiring requirement or incentive or that were located in minority-majority areas—does not provide an independent basis for liability in this case.  Section 2000e-2(a)(2) provides:

> It shall be an unlawful employment practice for an employer . . .
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

To prevail on a discrimination claim based on a segregation theory pursuant to Section 2000e-2(a)(2), Plaintiffs must show they suffered an adverse employment action due to the alleged segregation.  *See Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d 760 (7th Cir. 2016) ("The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of *any* Title VII claim.") (emphasis added); *see also Henry v. Milwaukee Cty.*, 539 F.3d 573, 585-86 (7th Cir. 2008) (applying adverse action analysis to a Section 2000e-2(a)(2) segregation claim); *E.E.O.C. v. DHL Exp. (USA), Inc.,* No. 10 C 6139, 2012 WL 5381219, at *2 (N.D. Ill. Oct. 31, 2012) ("Under either a discrimination or segregation theory, the [plaintiff] must prove that each claimant was subjected to an adverse employment action, which had an effect on the claimant.").

As an initial matter, FPN contends that Plaintiffs failed to prove segregation occurred because Dr. Bridges failed to rule out chance as a potential explanation for the concentration of African American fitters in a small subset of jobs.  FPN ignores the index of dissimilarity test Dr.

Bridges conducted showing that the distribution of hours among African American and white fitters at FPN occurred only 3% of the time in 10,000 simulations of random, nondiscriminatory assignment. Additionally, Plaintiffs' anecdotal evidence corroborated Dr. Bridges' observations as they each worked primarily if not completely on jobs in majority-minority areas or that required minority labor in 2010. Regardless, Plaintiffs' segregation theory fails as an independent theory of liability because Plaintiffs failed to show any adverse employment action due to the segregation.

"An adverse employment action is 'some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference.'" *Madlock v. WEC Energy Grp., Inc.*, No. 17-1278, 2018 WL 1312260, at *3 (7th Cir. Mar. 14, 2018) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). It must "materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't. of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Madlock*, 2018 WL 1312260, at *3 (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). The Seventh Circuit has articulated three categories of actionable adverse employment actions:

(1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination;

(2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and

(3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nichols*, 510 F.3d at 780 (citing *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir.2004)).

The Seventh Circuit recently elaborated on the adverse employment action requirement in the context of a segregation claim under Section 2000e-2(a)(2).  In *E.E.O.C. v. Autozone, Inc.*, the EEOC brought an action against an employer for allegedly transferring a black salesperson from a store that served a largely Hispanic clientele in order to make it a "predominantly Hispanic" store in violation of Section 20003-2(a)(2). 860 F.3d 564, 564 (7th Cir. 2017).  The purely lateral transfer required no reduction in pay, benefits or job responsibilities and was actually closer to the employee's home and the employee even admitted that he did not mind being transferred.  *Id.* at 567.  The district court found that the transfer did not adversely affect the employee's employment status and the Seventh Circuit affirmed.  *Id.* at 568.

On appeal, the EEOC presented a "novel" argument that "*any* action to limit, segregate, or classify employees because of race *automatically* violates § 2000e-2(a)(2)" so "plaintiffs need not "produce *evidence* that the challenged action deprived or tended to deprive him of employment opportunities or otherwise adversely affected his employment status" as those facts are "inherent in the act." *Id.* (emphasis in original).  The court rejected this argument as ignoring the plain text of the statute.  *Id.* at 569.  It noted, however, that subsection (a)(2) is broader subsection (a)(1)" and accordingly, held that the lack of an adverse employment action does not defeat a suit under Section 2000e-(2)(a)(2) but a plaintiff must at least show the employment action *tended* to deprive him of some job opportunity.  *Id.*[6]

---

[6] Plaintiffs cite to *Kyles v. J.K. Guardian Security Services, Inc.*, for the notion that "[w]hen a job applicant is not considered for a job simply because she is African-American, she has been limited, segregated or classified in a way that would tend to deprive not only her, but any other individual who happens to be a person of color, of employment opportunities."  (Dkt. No. 319 at ¶ 103 (citing *Kyles*, 222 F.3d 289, 298 (7th Cir. 2000)).  In *Kyles*, two black job testers posing as job applicants sued an employer under Section 2000e-2(a)(2) for hiring the white tester instead of them.  *Id.* at 292-94.  The district court held that the testers had no standing as hypothetical job applicants. The Seventh Circuit reversed, finding that humiliation and embarrassment are cognizable harms under Title VII and,

73

The crux of Plaintiffs' argument is that beginning in 2010, FPN considered white fitters for all of its jobs but considered African American fitters for only a subset of those jobs and that such practice tended to and did deprive plaintiffs of employment opportunities. In other words, Plaintiffs competed for a subset of all FPN jobs while white fitters competed for every job. To succeed on this theory, Plaintiffs had to show that in considering African Americans only for this subset of jobs, FPN's practice at least tended to diminish their financial compensation or benefits, to reduce their career prospects by preventing the use of certain skills or experience, or to alter job their conditions in a way that was humiliating or degrading.

Plaintiffs failed to show any detrimental economic effect to the segregation practice. There were no financial incentives to working in white areas or on jobs that did not require minority labor. All fitters were paid according to the wage rates set by the Local 281 CBA. Plaintiffs also did not show that they would have worked more hours if they had been considered for all jobs. Nothing suggests jobs in majority-minority areas or with minority hiring requirements were less frequent or were smaller jobs requiring less hours. In fact, it is entirely possible African American fitters benefited from being considered only for this subset of jobs if these jobs were, on average, larger jobs that lasted longer and required more hours. The point is, we simply do not know because Plaintiffs did not show this at trial. Plaintiffs rely on Dr. Bridges' analyses showing that work and earnings for African American fitters at FPN declined over time but nothing ties this trend to segregation. In fact, Dr. Bridges failed to account for

therefore, the testers alleged an injury sufficient to support standing. *Id.* at 300. In *E.E.O.C. v. Autozone*, the Seventh Circuit stated that "nothing in [Kyles] relieves a claimant in a § 2000e-2(a)(2) suit of the obligation to prove that the challenged job action deprived him of employment opportunities or otherwise adversely affected his employment status." *Id.* at 569.

chance or any other alternative explanation including, as would be relevant here, the share of total FPN jobs that fell within the claimed subset.

Plaintiffs fail to show the segregation otherwise significantly altered their work experience. Plaintiffs appropriately admit that working jobs in minority areas and with minority requirements is not in itself harmful. See*, e.g., Anzaldua v. Chicago Transit Auth.,* No. 02 C 2902, 2002 WL 31557622, at *3 (N.D. Ill. Nov. 15, 2002) (rejecting argument that a lateral transfer to a "predominantly black area" was an adverse employment action as "contain[ing] precisely the stereotypical notions and racist attitude that [plaintiff] herself complaints of"). In some cases, working on one of these jobs meant the fitter was closer to home and had a shorter drive to work each day. Jobs in majority-minority areas or with minority hiring requirements did not inherently require different skill sets. Plaintiffs served the same role as either a journeyman or foreman that they would have served and did serve on jobs in white areas. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (an assignment consistent with normal job duties cannot be an adverse action under Title VII), *overruled on other grounds by Ortiz*, 834 F.3d at 765-766; *Lancaster-Williams v. Pods Enterprises, Inc.,* No. 08 C 7144, 2010 WL 2382402, at *9 (N.D. Ill. June 10, 2010) ("The routes assigned to [plaintiff] were consistent with his job duties as a [] driver; that he may have preferred different assignments does not give rise to a Title VII discrimination claim."). Nothing about the jobs African Americans were assigned to tended to stunt career development or alter work conditions in such a way as to subject African American fitters to a humiliating, degrading, or unsafe environment. Plaintiffs failed to prove any detrimental effect of being segregated to only a subset of jobs at FPN and, therefore, failed to prove a claim under Section 2000e-2(a)(2).

## THE COURT'S CONCLUSIONS BASED ON EVIDENCE AND THE LAW

In short, the Court must focus on "the sole question that matters: Whether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different [race], and everything else had remained the same." *Ortiz*. 834 F.3d at 764.   After significant summary judgment briefing and rulings, numerous Daubert hearings, twelve days of trial, and hundreds of exhibits and charts, the Court concludes that there are simply too many other factors that could have influenced the placement decisions and therefore Plaintiffs have failed to meet their burden of proof.  The other variables that have not been eliminated include the following:

First, the unique nature of the pipefitting industry has not fully been accounted for in any of the expert analyses or attorney conclusions.   Pipefitters work when there are projects that Defendant has bid on, won, and staffed.   This means that when fitters are put on a job, they generally stay on that job until completion.   The job could last months and even years.   While a fitter is on a particular job, he is not available to be placed on another job.   Also, when a fitter finishes a job, there may not be another job for him if there are no new jobs opening at that time. As such, fitters frequently are laid off and are then available to work for other companies if jobs are available or to seek unemployment or to seek other types of employment.   The testimony at trial showed that all of these variations occurred with Plaintiffs.   The fallacy of the statistical reports presented by Plaintiffs is that every pipefitter is deemed to be available for every job every time.  This is not so.  As such, Plaintiffs have failed to show that they were not put on jobs based on their race but rather due to the availability of work.   This was exacerbated by the testimony that the pipefitting business suffered during the recession and lost numerous jobs making available positions more scarce.

Second, the role of the union has not been fully addressed in the placement of a pipefitter on a given job. These are union positions and the union supervisors influence the selection of whether a particular fitter can be placed on a job based on his rank and experience within the union. Therefore, suggesting that all pipefitters are available for all jobs has again failed to factor in the role of the union in selecting the appropriate fitter for each job. The rank and expertise of a particular fitter within the Union is based first on the Union's evaluation of a fitter. The Defendant then selects a fitter based on the Union's data.

Third, the Plaintiffs themselves testified that they were not always available for fitting jobs. In fact, some took a hiatus from pipefitting and explored other areas of employment, others were on different positions, and some were with other companies. It is important to note that a fitter must notify the Defendant that he wants to work and is available for a particular job if it opens. If he fails to do so, he will not be considered for the job. There were instances in the testimony where fitters admitted that they had not notified Defendants that they were available and wanted work. Again this is one of the significant variables not taken into account in the statistical evidence.

Fourth, although it is irrelevant to the issue of circumstantial evidence of discrimination, many fitters had excellent if not collegial working relationships with their supervisors and were not directly treated in a discriminatory manner. In fact, on more than one occasion, Plaintiff Truesdell was placed as a supervisor on a position and even was hired back to supervise a job after he had been laid off. Both direct actions weigh in favor of finding that race had little to do with job placement since they were actually hired over others who were not African American.

Fifth, although there were communications between Defendant managers about the irritation of dealing with minority hiring quotas for different projects, which would most

certainly reflect a potential discriminatory intent if the Plaintiffs were not put on projects, in truth, many of the Plaintiffs were put on projects, and even as supervisors on projects, when there was no minority hiring quota for that particular project.

Sixth, although Plaintiffs' attorneys have argued that placement in minority neighborhoods were projects that were less valuable to the Plaintiffs because they were minorities and were not chosen to be placed on larger projects where the location was more diverse (such as DePaul), the evidence has failed to support that conclusion. The fitters are paid a wage based on their union rank and experience, and therefore it cannot be argued that a job in one area is less valuable than one in another since the same wages would be paid. What can be argued is that a job like DePaul, which is not in a minority neighborhood is more appealing because it will last longer and therefore gives job stability. However, the testimony at trial did not support that Plaintiffs solely wanted these types of jobs and did not address whether certain Plaintiffs may actually prefer positions with less travel. More importantly, this issue circles back to the larger problem that was not addressed and that is whether African American pipefitters were available to be placed on these projects that were not in minority neighborhoods. Again, the statistical evidence was overly broad and did not take into account the numerous variables just mentioned above.

Seventh, although the testimony of the discriminatory emails was strong and damning as to those who sent and received them, Plaintiffs have failed to link those communications to the decision makers in this case. The expert testimony was not only fascinating but powerful. Recognizing that when a recipient of a discriminatory email does not respond to it by rejecting it or passes it on to another can be implicit validation of that behavior is real and valid. Creating that environment that accepts the denigration of a race, culture, or gender can most definitely

send a message to those making hiring and firing decisions that this is how management wants these decisions to be made. Without negating the validity of that testimony, Plaintiffs have simply not shown the link between the decision makers in this case and those communications.

Finally, all of these variables, if addressed, coupled with an environment of discriminatory tone and environment in upper management would have resulted in a very different case. Imagine, for example, if the evidence showed that African American pipefitters were only given small jobs in minority neighborhoods, never placed on larger projects, never rehired to be placed on open projects, and never hired for available work even though they were available and had expressed a willingness to work. Then, it would hardly be difficult to understand that the climate of discriminatory tone was sending a message to the supervisors who were making the placement positions to not place African American fitters in those positions. That is the case that Plaintiffs have attempted to show and that would be a case that the Court does not doubt could exist. Here, however, Plaintiffs have failed to show this and have failed to meet their burden of proof in spite of having significant time, briefing, testimony, and data to do so.

## CONCLUSION

The Court concludes that Plaintiffs Martin, Truesdell and Tejada have not proven that FPN laid off, failed to transfer or failed to rehire them because of their race.

Hon. Virginia M. Kendall
United States District Judge

Date: March 30, 2018